## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

-------------------------------------------------------------------

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| The Clare at Water Tower, | ) Case No. 11-46151 |
| | ) |
| Debtor. | ) Hon. Susan Pierson Sonderby |
| | ) Hearing Date: November 16, 2011 |
| | ) Hearing Time: **2:00 p.m. (CST)** |

-------------------------------------------------------------------

### NOTICE OF MOTION

PLEASE TAKE NOTICE THAT on November 15, 2011, the Debtor filed this **MOTION OF THE DEBTOR FOR INTERIM AND FINAL ORDERS UNDER 11 U.S.C. §§ 105, 361, 362, 363, AND 364 AND BANKRUPTCY RULES 2002, 4001, AND 9014 (I) AUTHORIZING DEBTOR, AS DEBTOR IN POSSESSION, TO (A) USE CASH COLLATERAL AND (B) INCUR POSTPETITION SECURED INDEBTEDNESS, (II) GRANTING SECURITY INTERESTS AND SUPER-PRIORITY CLAIMS, (III) GRANTING ADEQUATE PROTECTION, (IV) MODIFYING AUTOMATIC STAY AND (V) SETTING FINAL HEARING** (the "Motion").

PLEASE TAKE FURTHER NOTICE THAT on November 16, 2011 at 2:00 p.m. (prevailing Central Time) a hearing on the Motion shall take place before the Honorable Susan Pierson Sonderby or before any other judge who may be sitting in her place and stead, in Courtroom 642 in the United States Courthouse, 219 South Dearborn Street, Chicago, Illinois, at which time you may appear if you deem fit.

Dated: November 15, 2011

Matthew M. Murphy (ARDC No. 06208157)
DLA PIPER LLP (US)
203 North LaSalle Street, Suite 1900
Chicago, Illinois 60601
Telephone: (312) 368-4000
Facsimile: (312) 236-7516

Thomas R. Califano, NY Bar No. 2286144
George B. South III, NY Bar No. 2446771
DLA PIPER LLP (US)
1251 Avenue of the Americas
New York, New York 10020
Telephone: (212) 335-4500
Facsimile: (212) 335-4501

 /s/ Matthew M. Murphy
Proposed Counsel for the Debtor and Debtor in
Possession

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| The Clare at Water Tower, | ) Case No. 11-46151 |
| | ) |
| Debtor. | ) Hon. Susan Pierson Sonderby |
| | ) Hearing Date:  November 16, 2011 |
| | ) Hearing Time:  **2:00 p.m. (CST)** |

**MOTION OF DEBTOR FOR INTERIM AND FINAL ORDERS UNDER 11 U.S.C. §§ 105, 361, 362, 363, AND 364 AND BANKRUPTCY RULES 2002, 4001, AND 9014 (I) AUTHORIZING DEBTOR, AS DEBTOR IN POSSESSION, TO (A) USE CASH COLLATERAL AND (B) INCUR POSTPETITION SECURED INDEBTEDNESS, (II) GRANTING SECURITY INTERESTS AND SUPER-PRIORITY CLAIMS, (III) GRANTING ADEQUATE PROTECTION, (IV) MODIFYING AUTOMATIC STAY AND (V) SETTING FINAL HEARING**

The Clare at Water Tower ("The Clare" or the "Debtor"), debtor and debtor in possession, by its proposed attorneys, submit this motion (the "Motion") for entry of a interim and final orders under 11 U.S.C. §§ 105(a), 361, 362, 363, and 364, Rules 2002, 4001, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure, and Rule 4001-2 of the Local Rules for the United States Bankruptcy Court for the Northern District of Illinois (the "Local Rules") (i) authorizing the Debtor to (a) continue to use Cash Collateral (as defined below) and (b) obtain debtor in possession financing ("DIP Financing") pursuant to a debtor in possession financing facility (the "DIP Facility"), (ii) granting first-priority priming security interests and super-priority claims, (iii) granting adequate protection, (iv) modifying the automatic stay, and (v) scheduling a final hearing.  In support of this Motion, the Debtor relies on the Declaration of Judy Amiano in Support of Chapter 11 Petition and First Day Pleadings of the Clare at Water Tower.  In further support of this Motion, the Debtor respectfully represents as follows:

**Summary of Relief Requested**

In the ordinary course of business, the Debtor requires cash on hand and cash flow from their operations to fund their working capital and liquidity needs.  In addition, the Debtor requires cash on hand to fund this chapter 11 case while seeking to reorganize its business and/or sell its assets on a going concern basis.  Postpetition financing, in addition to the use of the Cash Collateral (defined below), is necessary in order for the Debtor to preserve sufficient liquidity to maintain ongoing day-to-day operations and fund their working capital needs.  Absent postpetition financing and the use of the Cash Collateral, the Debtor will be forced to cease operations of its business, thereby jeopardizing its ability to maximize the value of its estate.  Such an abrupt cessation of the business would have devastating effects on the residents of the CCRC, would cause the residents to suffer immediate and irreparable harm, and would leave the CCRC in a complete state of disarray.  Due to the nature of the Debtor's business and the impact that a prolonged chapter 11 case would have on the Debtor's residents, it is imperative that the Debtor have the necessary cash on hand to successfully reorganize or implement a sale process as quickly as possible.

To obtain postpetition financing, the Debtor engaged in good faith and arms-length negotiations with Redwood Capital Investments, LLC (the "DIP Lender").  The Debtor also discussed its post-petition financing needs with both The Bank of New York Mellon Trust Company, N.A., as successor in interest to J.P. Morgan Trust Company, N.A., as trustee (the "Bond Trustee") pursuant to certain Indentures (defined below) and Bank of America, N.A., (the "Bank"), the lender pursuant to that certain Letter of Credit Agreement, dated as of November 1, 2005.  Moreover, the Debtor's investment banker and financial advisor initiated contact with over 25 potential strategic and financial investors.  Subsequently, 11 strategic and financial

2

investors entered into confidentiality agreements with the Debtor and 10 conducted due diligence.

Term sheets were submitted by 7 different parties and were evaluated by the Debtor and the

Debtor's investment banker and financial advisor.  Subsequently, the Debtor and the Debtor's

investment banker and financial advisor engaged in negotiations with 4 strategic and financial

investors.  Although the Bank and its participants were provided with the opportunity to provide

the Debtor with debtor in possession financing, all declined to do so.

In addition, all of the Debtor's deposit accounts, cash and cash proceeds are

encumbered by security interests in favor of the Bond Trustee, and, as such, constitute "cash

collateral" (as such term is defined in Bankruptcy Code section 363(a), "Cash Collateral") of the

Bond Trustee.  The Debtor has an emergency need for the immediate use of Cash Collateral to

effectively and expeditiously manage this chapter 11 case.  The Bank and the Bond Trustee have

indicated to the debtor that they have no objection to the priming of the Bond Trustee's liens or

the use of Cash Collateral under the terms described herein.

The Debtor was successful in negotiating that certain Senior Secured Super-

Priority Debtor-in-Possession Loan Agreement, dated November 15, 2011 with the DIP Lender

(the "DIP Loan Agreement") as well as use of the Cash Collateral.  A copy of the DIP Loan

Agreement is annexed to the Interim DIP Order (defined below) substantially in the form of

Exhibit A.  A copy of the proposed order authorizing the Debtor to enter into the DIP Loan

Agreement on an interim basis is annexed hereto substantially in the form of Exhibit 1 (the

"Interim DIP Order"), and a copy of the proposed order authorizing the Debtor's use of Cash

Collateral on an interim basis is annexed hereto substantially in the form of Exhibit 2 (the

"Interim Cash Collateral Order").  Pursuant to Bankruptcy Rule 4001 and Local Rule 4001-2,

below are the essential terms of the DIP Facility and use of the Cash Collateral.[1]  The Debtor

submits that these terms are customary and reasonable for financing of this type.[2]

| | |
|---|---|
| **Borrower:** | The Clare. |
| **DIP Lender:** | Redwood Capital Investments, LLC. |
| **DIP Facility – Commitments, Availability and Purposes:** | Subject to the terms and conditions of the DIP Loan Agreement, the DIP Lender has agreed to provide the Borrower with multiple draw loans (collectively, the "<u>Commitments</u>") in an aggregate amount of up to $12.0 million (the "<u>Commitment Amount</u>"), as set forth below. |
| | Upon entry by the Bankruptcy Court of the Interim DIP Order, and until entry by the Bankruptcy Court of a final order satisfactory to the DIP Lender in its sole discretion approving the DIP Loan Documentation (as defined below) and the DIP Facility (the "<u>Final DIP Order</u>"), the Borrower shall be permitted to borrow from the DIP Lender a term loan in an initial aggregate principal amount of up to $2.5 million (the "<u>Initial DIP Loan</u>") in a single draw-down to fund working capital needs of the Debtor and administrative costs and expenses, in accordance with the Budget (as defined below). |
| | Upon the entry by the Bankruptcy Court of the Final DIP Order and prior to the consummation of a plan of reorganization or sale of all or substantially all of the Debtor's assets, the Borrower shall be permitted to borrow from DIP Lender an aggregate principal amount of up to $12.0 million including the Initial DIP Loan (the "<u>Subsequent Loans</u>" and together with the Initial DIP Loan, the "<u>DIP Loans</u>"), through a multiple draw term loan of up to $12.0 million, including the Initial DIP Loan, to fund (i) day-to-day working capital needs of the Debtor and (ii) the costs, expenses and other payments associated with this chapter 11 case (the "<u>Case</u>") and interest, fees and expenses of the DIP Facility, in accordance with the Budget. |
| **Liens on Collateral:** | All obligations of the Debtor under the DIP Facility shall be secured by (i) a first-priority priming lien and security interest  on all assets of |

---

[1] All capitalized terms herein, but not otherwise defined, shall have the meanings ascribed to them in the DIP Loan Agreement.

[2] To the extent the following summaries and descriptions in this Motion conflict with the express provisions of the DIP Loan Agreement, Interim DIP Order, and the Interim Cash Collateral Order, as applicable, the express provisions of the DIP Loan Agreement, Interim DIP Order and Interim Cash Collateral Order shall control.

the Debtor that are subject to existing liens (the "Existing Collateral"), (ii) first-priority blanket liens and security interests on all other assets of the Debtor that are not subject to existing liens, and (iii) super-priority administrative expense claims against the Debtor's bankruptcy estate.

Notwithstanding the foregoing, the liens and super-priority claims granted to the DIP Lender will be subject and subordinate only to (x) the rights of residents to the Resident Deposits pursuant to any agreement or order requiring Borrower to escrow or segregate any Resident Deposits for the benefit of residents, (y) the Carve Out.

Resident Deposits, as defined in the DIP Loan Agreement, mean all resident entrance fees and deposits pursuant to the residency and care agreements (or other applicable agreements) for the Project received by Borrower after the Filing Date, the resident entrance fees and deposits in (a) the approximate of Seven Hundred and Thirty Thousand Dollars ($730,000.00) as of the Closing Date presently held in a separate account (including any separate escrow account) at First Midwest Bank and (b) the approximate of One Hundred and Five Thousand Dollars ($105,000.00) as of the Closing Date presently held in a separate account (including any separate escrow account) at the Bank.

The Carve Out means (x) all accrued and unpaid fees that arise pursuant to 28 U.S.C. § 1930, plus (y) the payment of allowed and unpaid fees of professionals retained in the Case (other than ordinary course professionals), in an amount not to exceed $250,000 , that are incurred after the delivery of a written notice of the occurrence of one or more Events of Default, plus (z) any allowed accrued but unpaid fees and expenses owed to professionals retained in the Case (regardless of when allowed), to the extent consistent with the Budget, that were accrued on or before the date of delivery by the DIP Lender to the Debtor of a written notice of the occurrence of one or more Events of Default.  The DIP Lender shall not be granted any liens on any account held or controlled by the Bond Trustee pursuant to the terms of the documents governing the Debtor's Bonds.

No portion of the Carve-Out, any cash collateral or proceeds of the DIP Facility may be used for the payment of the fees and expenses of any person incurred challenging, or in relation to the challenge of the DIP Lender's liens or in any way that is materially adverse to the DIP Lender's rights under the DIP Facility.

All of the liens described herein shall be effective and perfected as of the entry of the Interim DIP Order or the Final DIP Order and without the necessity of the execution of mortgages, security agreements,

pledge agreements, financing statements or other agreements.

**Budget:** A 13-week rolling cash budget (with such supporting detail as the DIP Lender may reasonably request), as approved by the DIP Lender in its sole but reasonable discretion prior to the entry of the Interim DIP Order (and any subsequent approved budget, the "Budget"), is attached as Exhibit B to the Interim DIP Order and reflects on a line-item basis the Debtor's anticipated aggregate cash receipts and aggregate working capital expenses as determined by Debtor in its reasonable judgment as necessary or required for each week covered by the Budget.  For each rolling four week period in the Budget, tested every two weeks, (i) the aggregate receipts must equal or exceed 85% of the aggregate amount of projected receipts for such four week period and (ii) the aggregate disbursements shall not exceed 110% of the aggregate amount of projected disbursements for such four week period (collectively, the "Permitted Variance").  Upon the prior written request of the Debtor, or upon its own initiative, the DIP Lender in its sole but reasonable discretion may, without further Bankruptcy Court approval, authorize the Debtor in writing to exceed the Permitted Variance.  Every two weeks, , the Borrower shall provide the DIP Lender with an updated Budget, including a report of variances on a line-item basis.

**Term:** Unless otherwise agreed by the DIP Lender, borrowings shall be repaid in full, and the Commitments shall terminate (the "Termination Date"), on the earliest of:

(i) the date that is three business days after the Petition Date (defined below) if the Interim DIP Order has not been by such date;

(ii) the date that is 30 days after the entry of the Interim DIP Order if the Final DIP Order has not been entered by such date;

(iii)  if the Debtor has not received a reasonably acceptable letter of intent (the "Letter of Intent") from a potential stalking horse bidder (the "Stalking Horse Bidder") for the purchase of substantially all of the Debtor's assets (collectively, the "Assets") , by January 10, 2012 (the "LOI Date"), then, **February 15, 2012** (the "Plan Filing Date") if the Debtor has not filed a plan of reorganization (the "Plan") by such date;

(iv) If the Debtor has filed a Plan on or before the Plan Filing Date: (A) **March 21, 2012** if an order approving the Disclosure Statement with respect to the Plan has not been approved by such date; (B) **April 27, 2012** if the Plan has not been confirmed by such date; and (C) **May 11, 2012** if the Plan is not effective by such date;

6

(v) If the Debtor has not filed a Plan, but has executed a Letter of Intent with a Stalking Horse Bidder for the purchase of the Assets on or before the LOI Date: (A) **February 15, 2012** if the Debtor has not filed a motion for approval of certain bid procedures and authority to sell the Assets to the Stalking Horse Bidder or such other bidder making a higher and better offer for the Assets (the "<u>Bid Procedures and Sale Motion</u>"), reasonably satisfactory in form and substance to the DIP Lender, on or before such date; (B) **March 21, 2012** if an order, reasonably satisfactory in form and substance to the DIP Lender, approving the bid procedures requested in the Bid Procedures and Sale Motion (the "<u>Bid Procedures Order</u>") has not been entered on or before such date; (C) **April 30, 2012** if an order approving the sale of the Assets to the Stalking Horse Bidder or such other bidder making a higher and better offer for the Assets (the "<u>Sale Order</u>"), reasonably satisfactory in form and substance to the DIP Lender, has not been entered on or before such date; or (D) **May 11, 2012** if the sale contemplated by the Sale Order has not closed on or before such date;

(vi) **May 11, 2012** (the "<u>Final Maturity Date</u>") and

(vii) the acceleration of the loans and the termination of the Commitments in accordance with the terms of the DIP Loan Agreement.

**Closing Date:**        Closing Date for the DIP Facility to occur upon entry of the Interim DIP Order, but no later than three business days after the Petition Date.

**Interest Rate;**        As a material inducement to the DIP Lender to make the
**Commitment Fees:**    Commitments, the Borrower agrees to compensate the DIP Lender, from and after the Interim DIP Order, as set forth below.

4.0% per annum on the outstanding principal amount of the DIP Loans, payable monthly (the "<u>Interest Rate</u>"). All accrued but unpaid interest shall be payable at maturity of the DIP Facility (whether at stated maturity, by acceleration or otherwise). At all times that an Event of Default exists, the Interest Rate applicable to the DIP Facility (and all amounts outstanding thereunder) shall equal 7% per annum. Interest after maturity shall be payable upon demand.

A fee equal to 4.0% of the DIP Facility earned and paid upon entry of the Initial DIP Order.

A fee equal to 0.50% of any unused amount of the DIP Facility calculated based upon the following formula for any applicable period: ($12.0 million minus the average outstanding aggregate principal amount of DIP Loans during the period) times (0.50%) times (the

number of days in the period divided by 365). Such fee shall be calculated and the amount thereof added to the outstanding principal balance of the DIP Loans monthly.

**Amortization:** None.

**Optional Repayments:** No early repayment or prepayment of any obligations under the DIP Facility.

**Conditions of the Initial DIP Loan**    The obligation to provide the Initial DIP Loan (the "Initial Conditions") shall be subject to the satisfaction of the following conditions:

(a)    The entry of the Interim DIP Order by the Bankruptcy Court within three business days after the Petition Date;

(b)    All of the "first day orders" entered at the time of commencement of the Case shall be reasonably satisfactory in form and substance to the DIP Lender in all respects;

(c)    The DIP Lender's receipt and approval of the Budget;

(d)    The Debtor shall have granted the DIP Lender access to and the right to inspect all reports, audits and other internal information of the Debtor relating to environmental matters and any third party verification of certain matters relating to compliance with environmental laws and regulations reasonably requested by the DIP Lender;

(e)    DIP Lender shall have received all information (financial or otherwise) and copies of all documents reasonably requested by the DIP Lender or its counsel; and

(f)    Loyola University of Chicago ("Loyola") shall have delivered to the DIP Lender and the Debtor an estoppel certificate acceptable to the DIP Lender in the DIP Lender's sole discretion with respect to the Lease Agreement between Loyola and the Borrower dated as of November 2, 2005 (as it may have been amended, supplemented or modified) (the "Lease"), including a description of defaults by the Borrower thereunder.

**Conditions of Each DIP Loan:**    The obligation to provide each DIP Loan (including the Initial DIP Loan) shall be subject to the satisfaction of the Initial Conditions and each of the following conditions:

(a)    If after giving effect to a request for, and the borrowing of,

such DIP Loan, usage of the Commitments would not exceed $12.0 million;

(b)    In connection with the Initial DIP Loan, the Interim DIP Order shall have been entered and the Interim DIP Order shall be in full force and effect, and shall not have been amended, vacated, reversed, modified or rescinded or subject to a presently effective stay pending appeal;

(c)    For any Subsequent Loan, the Final DIP Order shall have been entered, shall be in full force and effect, and shall not have been amended, vacated, reversed, modified or rescinded or subject to a presently effective stay pending appeal;

(d)    No Event of Default and no condition which would constitute an Event of Default with the giving of notice or lapse of time or both shall exist;

(e)    Representations and warranties shall be true and correct in all material respects (except for representations and warranties that are qualified in any manner by materiality, which shall be true and correct in all respects) on and as of the date of each DIP Loan, except to the extent such representations and warranties specifically relate to an earlier date;

(f)    Receipt of one or more notices of borrowing from the Borrower in form and substance reasonably satisfactory to the DIP Lender;

(g)    Such other customary conditions as are reasonably required by the DIP Lender; and

(h)    For any Subsequent Loan, Loyola shall provide, prior to the Final Order Entry Date, an acceptable estoppel certificate and written notice to Lender that Lender qualifies as a potential owner and operator of Borrower's business and assets pursuant to the Lease

The request by the Borrower for, and the acceptance by the Borrower of, each DIP Loan under the DIP Facility shall be deemed to be a representation and warranty by the Borrower that the conditions specified above have been satisfied.

**Adequate Protection:**    Subject to entry of the Interim Cash Collateral Order granting the Bond Trustee adequate protection, the Bond Trustee and the Bank indicated to the Debtor that they will not object to the entry of the Interim DIP Order and the Interim Cash Collateral Order.   Such adequate protection is comprised of, among other things, an agreement by the Debtor to reserve and not use cash on hand as of the Petition

Date (estimated in the aggregate amount of $100,000), the granting of replacement liens on post-petition collateral subject to senior liens of the DIP Lender, and payment of the reasonable professional fees and expenses incurred by the Bond Trustee, the Bank and the Bondholders with respect to this Case.

**Representations and Warranties:**

The DIP Loan Agreement contain representations and warranties customary for debtor-in-possession financings (in each case subject to materiality, knowledge and other qualifiers as are customary or otherwise reasonably deemed appropriate by the DIP Lender), including, without limitation:

1.      Entity existence, status, power and authority.

2.      Due authorization, execution and delivery of the DIP Loan Agreement; legality, validity, binding effect and enforceability of DIP Loan Agreement.

3.      Execution, delivery, and performance of the DIP Loan Agreement do not violate law or other contractual obligations enforceable against the Debtor without further action by the Bankruptcy Court.

4.      No default under the DIP Loan Agreement.

5.      Insurance.

6.      Corporate structure of the Borrower.

8.      Validity, first priority and perfection of security interests in the Collateral.

9.      No event, act or condition subsequent to the Petition Date that has or is reasonably expected by the DIP Lender to (a) have a material adverse effect on the business, operations, properties, assets, or condition (financial or otherwise) of the Debtor, taken as whole, or (b) impair the ability of the Debtor to perform, or the DIP Lender to enforce, the obligations under the DIP Facility.

**Affirmative Convenants:**

The DIP Loan Agreement contains affirmative covenants customary for debtor-in-possession financings (including customary exceptions), including, without limitation:

1.      Delivery of financial statements, reports, accountants' letters, projections, budgets, officers' certificates and other information concerning the Debtor and its finances and operations, in each case to the extent reasonably requested by the DIP Lender.

2.      Compliance with the Budget to the extent set forth above.

3.      Delivery of notices of default(s) under the DIP Loan

Agreement, litigation and other material events.

4.      Subject to the Budget and the other terms and conditions of the DIP Loan Agreement, continuation of business and maintenance of existence and material rights and privileges of the Debtor.

5.      Maintenance of property and insurance of the Debtor, naming the DIP Lender as a named insured.

6.      Right of the DIP Lender to inspect property and books and records of the Debtor upon reasonable prior written notice and during normal business hours.

7.      Compliance with applicable laws in all material respects (including, without limitation, applicable ERISA and environmental laws and regulations).

8.      Further assurances reasonably requested by the DIP Lender (including, without limitation, with respect to security interests in after-acquired property).

9.      Use of proceeds.

10.      Maintenance of DIP Lender's senior secured status.

11.      Subject to the Budget and the other terms and conditions of the DIP Loan Agreement, payment of post-petition taxes.

**Negative Covenants:**      The DIP Loan Agreement contains negative covenants customary for debtor-in-possession financings (including exceptions), including, without limitation:

1.      Limitation on indebtedness and contingent obligations relating thereto.

2.      Limitation on liens and further negative pledges.

3.      Limitation on guarantee obligations, if any.

4.      Unless the DIP Loans and all other amounts owing to the DIP Lender shall have been paid in full in cash and the Commitments have terminated, limitation on mergers, consolidations, liquidations, dissolutions, acquisitions and non-ordinary course asset sales, except as set forth in the DIP Loan Agreement.

5.      Limitation on leases.

6.      Limitation on payment restrictions affecting subsidiaries and

other payments to affiliates except as otherwise provided in the Budget.

7.      Limitation on capital expenditures, except to the extent contemplated by the Budget.

8.      Limitation on investments, acquisitions, loans and advances, except to the extent contemplated by the Budget.

9.      Limitation on transactions with affiliates; limitation on sale and leasebacks.

10.     Limitation on change of fiscal year.

11.     Limitation on changes in business conducted.

12.     Prohibition on payment of prepetition claims (other than as approved by the Bankruptcy Court and reasonably acceptable to the DIP Lender or as otherwise set forth in the Budget or permitted by the DIP Loan Agreement) and payment of non-budgeted postpetition items.

13.     Prohibition on consenting to the granting of adequate protection payments or liens, superpriority administrative expense claims or liens having a priority senior or pari passu with the liens granted to the DIP Lender, except as otherwise expressly permitted by the DIP Loan Agreement or the Cash Collateral Order.

**DIP Lender's Remedies Upon Events of Default:**   Upon the occurrence and continuance of any of the following Events of Default beyond the applicable grace period (if any) set forth below, the DIP Lender may take all or any of the following actions without further order of or application to the Bankruptcy Court, <u>provided</u> that with respect to items (iii) and (iv) below, the DIP Lender shall provide the Borrower, any Committee in the Case and the United States Trustee for the Northern District of Illinois with five (5) business days prior written notice and <u>provided</u>, <u>further</u>, that upon receipt of the notice referred to in the immediately preceding clause, the Borrower may continue to make ordinary course disbursements from such accounts referred to in (iii) below to the extent and at the times set forth in the Budget, but may not withdraw or disburse any other amounts from such account (and, in any hearing after the giving affect of the aforementioned notice, the only issue that may be raised by any party in opposition thereto being whether, in fact, an Event of Default has occurred and is continuing);

(i)      declare the principal of and accrued interest on the outstanding borrowings to be immediately due and payable;

(ii)    terminate the Commitments;

(iii)    set-off any amounts held for the account of the Debtor as cash collateral or in any accounts maintained with the DIP Lender or any of its affiliates; and

(iv)    take any other action or exercise any other right or remedy (including, without limitation, with respect to the liens in favor of the DIP Lender) permitted under the DIP Loan Documentation, or by applicable law.

**Events of Default:**    The occurrence of any of the following shall constitute an Event of Default:

(a)    Failure by the Borrower to pay principal, interest or fees when due in respect of the DIP Loan;

(b)    Breach by the Debtor of any of the affirmative and negative covenants described above, subject in the case of certain convenants to a 10-day grace period;

(c)    Breach by the Debtor of any other covenant or agreement contained in the DIP Loan Documentation after written notice thereof from DIP Lender (subject, in the case of certain affirmative covenants, to a 10-day grace period);

(d)    Occurrence of the Termination Date as the result of any failure to accomplish or complete any milestone listed in the DIP Loan Agreement by the date specified for such milestone (unless such date is extended by the DIP Lender, in its sole discretion);

(e)    Any representation or warranty made by the Debtor shall prove to have been incorrect in any material respect when made;

(f)    The Case shall be dismissed or converted to a chapter 7 case; a chapter 11 trustee or an examiner with enlarged powers relating to the operation of the business of the Borrower (powers beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code) shall be appointed in the Case; or any other superpriority Claim (other than the Carve-Out upon entry of the Final DIP Order) or lien which is <u>pari passu</u> with or senior to the claims or liens of the DIP Lender shall be granted in the Case;

(g)    Other than (a) payments authorized by the Bankruptcy Court (i) in respect of accrued payroll and related expenses as of the commencement of the Case or (ii) in respect of certain creditors, in each case to the extent authorized by one or more "first day" orders reasonably satisfactory to the DIP Lender, (b) payments authorized by

the Bankruptcy Court with respect to any settlement or other stipulation with any creditor of the Borrower, other than the DIP Lender or pursuant to the Interim Cash Collateral Order, as adequate protection or otherwise individually or in the aggregate not in excess of $100,000 for any and all such creditors unless approved in writing by the DIP Lender; and (c) as otherwise contemplated by the Budget, the Debtor shall make any payment (whether by way of adequate protection or otherwise) of principal or interest or otherwise on account of any pre-petition indebtedness or payables of the Debtor;

(h)     The Bankruptcy Court shall enter an order granting relief from the automatic stay to the holder or holders of any security interest to permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) on any assets of the Borrower that have an aggregate value in excess of $100,000;

(i)     A Change of Control shall occur;

(j)     Any material provision of the DIP Loan Agreement, the Interim DIP Order or the Final DIP Order shall cease to be valid and binding on the Debtor, or the Debtor shall so assert in any pleading filed in any court;

(k)     An order (i) shall be entered reversing, staying for a period in excess of fourteen (14) days, vacating or rescinding the Interim DIP Order or the Final DIP Order or (ii) shall be entered amending, modifying or supplementing the Interim DIP Order or the Final DIP Order without the prior written consent of the DIP Lender;

(l)     Loyola seeks to lift or modify the automatic stay to pursue remedies under the Lease;

(m)     Loyola under the Lease shall fail to provide, prior to the Final Order Entry Date, written notice to Lender that Lender qualifies as a potential owner and operator of Borrower's business and assets pursuant to the Lease;

(n)     The Debtor shall make any motion or take any other steps to reject or terminate the Lease or modify any of the terms thereof; and

(o)     The Debtor shall exceed the Permitted Variance for any testing period pursuant to the Budget.

**Credit Bidding:**          The DIP Lender shall have the right to credit bid and or bid in excess of the amount of the DIP Loan, if necessary, in any sale of Collateral and shall have standing with respect to any such sale or hearing related

thereto.

**Costs and Expenses; Indemnification:** All reasonable and documented out-of-pocket costs and expenses of the DIP Lender (including, without limitation, reasonable fees and disbursements of counsel without the need of filing an application for compensation with the Bankruptcy Court) incurred in connection with the transactions contemplated hereby shall be payable by the Borrower whether or not the transactions contemplated hereby are consummated. The Borrower shall also pay all reasonable and documented out-of-pocket costs and expenses of the DIP Lender (including, without limitation, reasonable fees and disbursements of counsel) in connection with (i) the negotiation, preparation and execution of all documentation executed on or before the Closing Date in connection with the transactions contemplated hereunder, whether or not consummated, and (ii) the enforcement of any rights and remedies under the DIP Loan Documentation.  All costs and expenses required to be paid by the Borrower hereunder are collectively referred to as the "Expense Payments".  All Expense Payments that become due and owing under the DIP Loan Documentation prior to the maturity of the DIP Loans shall be automatically added to the principal amount of the DIP Loans (and begin to bear interest) on the third Business Day following the Borrower's receipt of an invoice therefor from the DIP Lender.  All Expense Payments that become due and owing after maturity of the DIP Loans (whether at stated maturity, by acceleration or otherwise) shall be due and payable on demand.  The Borrower shall indemnify the DIP Lender against any liability arising in connection with the transactions contemplated hereby (other than in the case of the gross negligence, bad faith or willful misconduct of any indemnified person).

**Assignments and Participations** Usual and customary assignment and participation provisions reasonably satisfactory to the DIP Lender, subject to the Borrower's prior written consent, not to be unreasonably withheld or delayed, except that no such consent shall be required if an Event of Default has occurred and is continuing or in the case of any such assignment or participation to an affiliate of any DIP Lender.

## Jurisdiction and Venue

1.    This Court has jurisdiction over this motion pursuant to 28 U.S.C. §§ 157 and

1334.  This matter is a core proceeding under 28 U.S.C. § 157(b)(2).

2.       Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3.       The statutory predicates for the relief requested herein are sections 105, 361, 362, 363, and 364 of the Bankruptcy Code and rules 2002, 4001, and 9014 of the Federal Rules of Bankruptcy Procedures (the "Bankruptcy Rules") and Rule 4001 of the Local Rules of the United States Bankruptcy Court for the Northern District of Illinois (the "Local Rules").

## Background

4.       On the date hereof (the "Petition Date"), the Debtor commenced this case by filing a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").  No trustee, examiner or creditors' committee has been appointed in this case.

5.       The Debtor has continued in the possession of its property and has continued to operate and manage its business as a debtor in possession pursuant to Bankruptcy Code sections 1107(a) and 1108.

## Overview of the Debtor's Business

### A.       Description of the Continuing Care Retirement Community.

6.       The Clare, which opened in December 2008, is a fifty-three-story (53) high-rise continuing care retirement community (the "CCRC") comprised of 24,864 square feet on 0.6 acres of land (the "Property") owned by Loyola University of Chicago ("Loyola").  The CCRC offers seniors a full continuum of care all in one building, as opposed to a traditional CCRC which operates in a campus-style setting.  The CCRC provides living accommodations and related healthcare and support services to a target market of upper-middle-class-income seniors aged sixty-two (62) years and older.  The CCRC enables seniors to remain in the same place as they age and their needs change by providing various levels of support and care.  In addition, the CCRC provides residents with multiple entertainment outlets and other social benefits for all

stages of their retirement living.  The CCRC's amenities include all aspects of everyday life, including the following: fitness center, indoor aquatic center, beauty salon, barbershop, day spa, social lounge, state-of-the-art business center, private and main dining rooms, performance center, formal library, arts and crafts studio, media center, three chapels and a meditation room.

7.      As of November 1, 2011, the CCRC had (a) 248 independent living units, of which 82 are occupied, resulting in a 33.1% occupancy rate of independent living units; (b) 54 assisted living units, of which 28 are occupied, resulting in a 51.9% occupancy rate of assisted living units; and (c) 32 skilled nursing units, of which 29 are occupied, resulting in a 90.6% occupancy rate of skilled nursing units.

8.      The Clare has received a determination letter from the Internal Revenue Service setting forth its determination that The Clare is exempt from federal income taxation under Section 501(a) of the Internal Revenue Code as an organization described in Section 501(c)(3) of the Internal Revenue Code.

**B.      Development of The Clare.**

9.      The Clare has been developed as follows: (i) The Clare entered into a lease agreement for the Property; (ii) The Clare raised $229 million in variable and fixed rate bond debt (tax-exempt and taxable) to finance the development and construction of The Clare; (iii) The Clare was constructed and operation began in December 2008.

i.      The Lease Agreement.

10.     The Clare currently leases Property pursuant to a ninety-nine-year (99) ground lease agreement entered into between The Clare and Loyola, dated as of November 2, 2005 (the "Lease Agreement").  The Lease Agreement expires on November 1, 2104.  The Clare is responsible for an annual base rent of approximately $2 million, adjusted annually based on the

change in the Consumer Price Index, and subject to a maximum equivalent to a compounded four percent (4%) annual increase.

    ii.  <u>Pre-Petition Capital Structure.</u>

   11.  The Clare secured permanent financing through a municipal bond offering (tax-exempt and taxable) by both the Illinois Finance Authority (the "<u>Authority</u>") and The Clare, with the total principal amount of $229 million (the "<u>Series 2005 Bonds</u>") issued and secured pursuant to certain bond trust indentures (the "<u>Indentures</u>") between: (i) the Authority and The Bank of New York Mellon Trust Company, N.A., as successor in interest to J.P. Morgan Trust Company, N.A., as trustee (the "<u>Bond Trustee</u>"); and (ii) between The Clare and the Bond Trustee.  The Clare is also indirectly liable to the holders of the Series 2005 Bonds (the "<u>Bondholders</u>") by virtue of its obligations under the Leasehold Mortgage and Security Agreement, dated as of November 2, 2005, by and between The Clare the Bond Trustee with respect to the Series 2005 Bonds.

   12.  The issuance of the Series 2005 Bonds was comprised of Series 2005A Bonds, Series 2005B-1 Bonds, Series 2005B-2 Bonds (collectively with the Series 2005B-1 Bonds, the "<u>Series 2005B Bonds</u>"), Series 2005C Bonds (together with the Series 2005A Bonds and the Series 2005B Bonds, the "<u>Series 2005 Fixed Rate Bonds</u>"), Series 2005D Bonds and Series 2005E Bonds (together with the Series 2005D Bonds, the "<u>Series 2005 Variable Rate Bonds</u>"). The Series 2005A Bonds, issued by the Authority, initially consisted of $74 million of tax-exempt fixed rate revenue bonds with the principal payable in varying annual installments through 2038 and interest payable semiannually on May 15 and November 15 of each year.  The Series 2005B Bonds, issued by the Authority, initially consisted of an aggregate amount $10 million of tax-exempt fixed rate revenue bonds with a final maturity date May 15, 2038 and interest payable semiannually on May 15 and November 15.  The Series 2005C Bonds, issued by

the Authority, initially consisted of $7.5 million in tax-exempt fixed rate revenue bonds with a final maturity date of May 15, 2012 and interest payable semiannually on May 15 and November 15. The Series 2005D Bonds, issued by the Authority, consist of $125 million in tax-exempt variable rate demand revenue bonds with a final maturity date of May 15, 2038 and interest payable monthly on the first business day of each month. The Series 2005E Bonds, issued by The Clare, consist of $12.5 million in taxable variable rate demand revenue bonds with a final maturity date of May 15, 2038 and interest payable monthly on the first business day of each month.

13.     The proceeds of the Series 2005 Bonds were loaned to The Clare pursuant to certain loan agreements (the "Loan Agreements") to: (i) pay certain costs of acquiring, constructing and equipping the CCRC; (ii) pay a portion of the interest on the tax-exempt Series 2005 Bonds; (iii) fund debt service reserve funds for the tax-exempt Series 2005 Bonds; (iv) provide working capital; and (v) pay certain expenses incurred in connection with the issuance of the tax-exempt Series 2005 Bonds, the initial credit facility for the Series 2005D Bonds and Series 2005E Bonds and the remarketing of the Series 2005 Variable Rate Bonds.

14.     An irrevocable transferable letter of credit was issued in favor of the Bond Trustee by the Bank in the maximum initial stated amount of $137.5 million, pursuant to that certain Letter of Credit Agreement, dated as of November 1, 2005 (the "LOC Agreement"), which provided liquidity support for the principal of, and interest on, the Series 2005 Variable Rate Bonds. Pursuant to the LOC Agreement, upon an event of default thereunder, the Bank is able to effect a tender of the Series 2005 Variable Rate Bonds.

15.     On July 15, 2010, investors holding approximately $91.5 million of the Series 2005 Fixed Rate Bonds agreed to exchange their bonds for fixed rate Series 2010A and Series

2010B Bonds (together, the "Series 2010 Bonds" and together with the Series 2005 Bonds, the "Bonds") totaling approximately $87.5 million (the "2010 Exchange Offer").  The investors that exchanged their bonds received (a) Series 2010A Bonds in an aggregate principal amount equal to seventy percent (70%) of the principal amount of their prior bonds; and (b) Series 2010B Bonds in an aggregate principal amount equal to thirty percent (30%) of the principal amount of their prior bonds.  The Series 2010A Bonds, issued by the Authority, consist of $61,253,500 in tax-exempt fixed rate revenue refunding bonds with principal payable in varying annual installments through 2038 and interest payable semiannually on May 15 and November 15.  The Series 2010B Bonds, issued by the Authority, consist of $25,251,000 in tax-exempt capital appreciation bonds with a final maturity date of May 15, 2050 and a five percent (5%) payment-in-kind interest rate.

16.     The aggregate principal amount of the 2005 Variable Rate Bonds, Series 2010 Bonds, Series 2005A Bonds, Series 2005B Bonds and Series 2005C Bonds that remains outstanding is approximately $229 million.

iii.     Construction.

17.     Although The Clare was originally projected to cost approximately $120.5 million, the final construction cost was approximately $130 million (excluding financing costs, start-up expenses and working capital).  The Clare opened in December 2008 and the first resident moved in on December 10, 2008.

C.     **Management of the CCRC.**

18.     The CCRC is managed by FSCSC pursuant to a Management Services Agreement entered into between The Clare and FSCSC, dated as of October 24, 2005 (the "Management Agreement"), which automatically renews on an annual basis.  FSCSC was established in 1988 by the Franciscan Sisters of Chicago ("FSC") to operate the senior services, facilities and

programs sponsored by the FSC.  FSCSC provides services such as nursing care, senior housing, home health care and community services to the Chicago area and to other neighboring states.

19.    FSCSC also provided development and construction services to The Clare, pursuant to a Development Services Agreement, dated as of October 18, 2005 by and between Clare and FSCSC (the "Development Services Agreement").

20.    FSCSC has also invested over $14 million in cash in The Clare, including $3 million of which was invested after the 2010 Exchange Offer.

21.    Pursuant to several collateral assignments dated as of December 13, 2005, entered into between The Clare, the Bond Trustee and the Bank (collectively, the "Collateral Assignments"), The Clare assigned its right under the Development Services Agreement, the Management Agreements and the Residency Agreements (as defined below) to the Bond Trustee and the Bank.

**D.    Residents of the CCRC.**

  i.    Residency Agreements.

22.    Prior to a resident's occupancy of an independent living unit in the CCRC, The Clare enters into a residency agreement (each a "Residency Agreement") with the resident. Under the terms of the Residency Agreement, each resident agrees to pay to The Clare a residence deposit ("RD") and a related monthly service fee ("Monthly Service Fee").  In return, the resident is permitted to occupy a unit in the CCRC for his or her lifetime, subject to certain conditions.  The resident can terminate the Residency Agreement without cause on sixty-days' notice, and the Residency Agreement can be assigned without the resident's prior consent.

  ii.    RDs.

23.    The RD is split into two separate installments.  The first installment, the reservation deposit, is generally an amount equal to ten percent (10%) of the RD, and is due

when the resident signs a reservation agreement. The second installment, the Deposit Balance, is due on or before the resident moves into the CCRC.

24.     As of September 30, 2011, the RDs ranged from just over $262,500 to over $1.2 million per unit and the Monthly Service Fees ranged from approximately $2,723 to $5,512 per unit (excluding custom units). Interest income generated from the investment of the RD by The Clare is paid to The Clare to contribute to operating income and to help pay for operating and capital costs. When a resident leaves The Clare, refunds are paid depending on the type of plan into which that resident has entered. The four types of plans are as follows:

a.   90% Refundable Plan: The resident is responsible for paying the RD upon move-in and a monthly service fee during the course of his or her stay; if the resident leaves The Clare, a ninety percent (90%) refund of the RD is due to the resident or applicable estate, payable when the RD for another unit is received.

b.   50% Refundable Plan: The resident is responsible for paying the RD upon move-in and a monthly service fee during the course of his or her stay; if the resident leaves The Clare, a fifty percent (50%) refund of the RD is due to the resident or applicable estate, payable when the RD for another unit is received.

c.   Amortizing Refundable Plan: The resident is responsible for paying the RD upon move-in and a monthly service fee during the course of his or her stay; if the resident leaves The Clare, the resident is due 90% of the RD minus two percent (2%) per month of the resident's occupancy, payable when the RD for another unit is received.

d.   Rental Plan: The resident is responsible for paying a Monthly Service Fee ranging from $3,540 – $7,165 during the course of his or her stay.

e.   Assisted Living Plan: The resident is responsible for a Monthly Service Fee ranging from $5,836 - $7,427. Memory Support Assisted Living Monthly Service Fees range from $7,214 - $8,275.

### E.    State Regulations.

25.    The CCRC industry is heavily-regulated by state authorities.  Each state has different regulations concerning, among other things, disclosure of financial statements, solvency of the facility, maintenance of a certain amount of reserves, and the refunding of RDs.

26.    The not for profit entity operating each CCRC is required to satisfy the regulations of the state where its facilities are located, in this case the state of Illinois.  Remedies for violations of these state regulations include temporary suspension of the facility's license, permitting residents to obtain liens, increased oversight of the facility, restricting the facility's ability to accept new residents, and closing the facility.

### F.    Corporate Governance.

27.    FSCSC, an Illinois not for profit corporation, is the sole member of The Clare.  Under the bylaws of The Clare (as amended, the "Bylaws"), the Board of Directors of The Clare (the "Board") has all of the powers of governance of The Clare except for certain powers of FSCSC as the sole member of The Clare (the "Reserved Powers").  The Reserved Powers include, among other things, the appointment and removal of Appointed Directors (as defined below) and any other rights of a member under the statutes or charter.

28.    Under the Bylaws, there are two classes of directors:  (i) the persons serving from time to time as members of the Executive Committee of FSCSC (the "Ex-Officio Directors"); (ii) any other person that the FSCSC Board determines from time to time to appoint (the "Appointed Director").  Any Appointed Director may be removed at any time by FSCSC with or without cause.

29.    The Officers, other than the Chairperson and the President/CEO are appointed by the Board.  Any Officer may be removed by the Board or FSCSC at any time with or without cause.

**Events Leading to Chapter 11**

    A.      **The Decline in the Market.**

    30.     During the past few years, CCRCs, including The Clare, have suffered substantial declines in sales and occupancy and have faced various obstacles in their construction and development as a result of the struggling economy, the weakened credit environment, limited access to capital and declining real estate values, among other things. Prospective senior residents are having difficulty selling their homes and have lost significant amounts of their retirement funds in the financial market, making it difficult, if not impossible, for them to move into or remain in senior housing facilities. As a result of these challenging market conditions, The Clare has suffered a substantial loss of revenue and lower than anticipated absorption rates.

    31.     A few months prior to the original opening date, The Clare had entrance fee deposits on hand for approximately ninety percent (90%), or 220 of its 248, independent living units. Nonetheless, thirteen months after The Clare's opening, only eighty of the RDs converted into move-ins due to the cancellation by many depositors of their contracts. Due to the struggling economy and the weak housing market, The Clare has been unable to settle units at rates underwritten at the time of the 2005 financing. Moreover, the delays in construction forced The Clare to open its doors subsequent to the collapse of Lehman Brothers—an extremely volatile time for the CCRC industry (particularly high-end developments such as The Clare) in light of the historic drop in the value of homes and investment portfolios.

    32.     Despite the optimism resulting from the 2010 Exchange Offer, settlement activity and operating conditions failed to improve to the level anticipated at the time of the exchange. Indeed, in February of 2011, The Clare negotiated with Loyola to defer rent payments through December 2011 and Loyola is currently owed approximately $2 million by The Clare.

**B.       The Debtor's Prepetition Restructuring Attempts.**

33.       On September 1, 2011, The Clare failed to make debt service payments to the Bond Trustee with respect to its Bonds.  As a result of such failure to pay, an event of default occurred under The Clare's bond documents.

34.       In addition, The Clare did not: (i) reimburse the Bank for an interest drawing with respect to the Series 2005 Variable Rate Bonds on September 1, 2011; or (ii) pay letter of credit fees due to the Bank on September 1, 2011 under the LOC Agreement.  As a result of such failure, events of default occurred under the LOC Agreement.  As a result of such events of default, the Bank caused a mandatory tender of the Series 2005 Variable Rate Bonds resulting in a draw by the Bond Trustee under the LOC Agreement.  Consequently, the Bank is the current holder of the Series 2005 Variable Rate Bonds.

35.       From and after September 21, 2011, The Clare conducted negotiations with the Bank and significant holders of the Series 2010 Bonds regarding a forbearance, and the release of trustee-held funds to fund The Clare's operations while an out-of-court restructuring and/or sale process could be pursued.  Despite these efforts, on or about October 28, 2011, the holders indicated that they did not have the requisite consent to proceed with the negotiated path going forward.  Consequently, The Clare immediately commenced preparing for a bankruptcy filing, including raising a priming DIP financing facility to fund the sale of the CCRC.  The Clare has a significant need for cash flow and is in dire need of financing.  Indeed, The Clare is dangerously close to running out of  working capital at the time of this filing.

**The Debtor's Need for Postpetition Financing**

36.       Prior to the Petition Date, the Debtor financed its operations with cash from operating activities and a variety of financing arrangements.  Because of the substantial decline in the housing market and deterioration of the economy as a whole, the Debtor is unable to

generate sufficient cash to operate its business or satisfy its obligation under the various binding agreements described above.  The Debtor requires both the use of cash collateral and the financing proposed herein to continue to operate their business until consummation of a plan.

37.      If the Debtor is unable, on a consistent basis, to maintain its business and demonstrate financial stability to existing and future residents, the CCRC will lose existing residents, employees, and vendors, will be unable to attract new residents and will be forced to cease operations.  This will not only cause harm to the Debtor, but it will also cause harm to the residents, who will not receive proper care and may be forced to move.  Therefore, postpetition financing and the use of cash collateral is essential to the Debtor's continued ability to operate, to maintaining the value of its assets, and to the success of this chapter 11 case.

38.      The DIP Facility provides that the Debtor may draw on a portion of the funds immediately (an initial portion on an interim basis and the remainder after entry of the Final DIP Order) to meet their administrative and operational obligations in the period leading up to confirmation of the Plan and/or sale of assets and resolution of this chapter 11 case.  The DIP Facility will instill confidence in existing and future residents, employees, and vendors, and it will help relieve any uncertainty that people may have concerning the Debtor's reorganization. In order to stabilize and continue to operate their business, the Debtor has determined, in the exercise of their sound business judgment, that the DIP Facility is necessary and appropriate. Moreover, both the Bond Trustee and the Bank have indicted to the Debtor that they do not intend to object to the relief requested herein.

## Relief Requested

39.     By this Motion, the Debtor requests the entry of the interim and final orders (i) authorizing the Debtor to obtain the DIP Facility from the DIP Lender on a senior secured superpriority basis, pursuant to Bankruptcy Code sections 105, 361, 362, 363, and 364; (ii) authorizing the use of cash collateral and (iii) scheduling a final hearing pursuant to Bankruptcy Rule 4001(b) and (c).

**A.     Applicable Authority for Obtaining DIP Financing**

40.     Bankruptcy Code section 364(c) and (d) provides:

(c)     If the trustee is unable to obtain unsecured credit allowable under section 503(b)(l) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt -

(1)     with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title;

(2)     secured by a lien on property of the estate that is not otherwise subject to a lien; or

(3)     secured by a junior lien on property of the estate that is subject to a lien.

(d)(1) The court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if:

(A)      the trustee is unable to obtain such credit otherwise; and

(B)     there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

(2)     In any hearing under this subsection, the trustee has the burden of proof on the issue of adequate protection.

41.     Debtors who exercise sound business judgment, within the confines of the policies underlying the Bankruptcy Code, in obtaining postpetition financing are afforded deference by courts.  See In re Ames Dep't Stores, Inc., 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990).

42.    Bankruptcy Rule 4001(c) governs the procedures for obtaining authorization for debtor in possession financing and provides, in relevant part:

> The court may commence a final hearing on a motion for authority to obtain credit no earlier than 14 days after service of the motion. If the motion so requests, the court may conduct a hearing before such 14 day period expires, but the court may authorize the obtaining of credit only to the extent necessary to avoid immediate and irreparable harm to the estate pending a final hearing.

43.    The Debtor seeks entry of the Interim DIP Order in order to avoid immediate and irreparable harm to their estates. Accordingly, pursuant to Bankruptcy Rule 4001 and Local Rule 4001-2, the Court is authorized to grant the relief requested herein.

**B.    The Debtor's Use of Cash Collateral Should Be Approved**

44.    The Debtor has a critical need for the immediate use of the Cash Collateral. The Debtor requires use of the Cash Collateral to pay present operating expenses including payroll and to pay vendors to ensure a continued supply of services essential to the Debtor's residents. If unable to use the Cash Collateral, the Debtor would be unable to operate its business.

45.    Under section 363(c)(2) of the Bankruptcy Code, the Debtor may not use Cash Collateral without the consent of the Bond Trustee or authority granted by the Court. Bankruptcy Code section 363(e) provides that on request of an entity that has an interest in property to be used by a debtor, the Court shall prohibit or condition such use as necessary to provide adequate protection of such interest. First, the Bond Trustee and the Bank have indicated to the Debtor that they do not intend to oppose (i) the use of the Cash Collateral pursuant to the DIP Budget or (ii) the priming of the Bond Trustee's liens as set forth in, and in accordance with, the Interim DIP Order and the Interim Cash Collateral Order. Second, the Debtor submits that the adequate protection to be provided to the Bond Trustee, namely, an agreement by the Debtor to reserve and not use cash on hand as of the Petition Date (estimated in

the aggregate amount of $100,000), the granting of replacement liens on post-petition collateral subject to senior liens of the DIP Lender, and payment of the reasonable professional fees and expenses incurred by the Bond Trustee, the Bank and the Bondholders with respect to this Chapter 11 Case, is sufficient to approve the use of the Cash Collateral under section 363 of the Bankruptcy Code.

**C.      The DIP Lender is Entitled to Priming Liens as Set Forth in the DIP Facility**

46.      Pursuant to Bankruptcy Code section 364(c), if a debtor is unable to obtain postpetition credit on an unsecured basis, a court may authorize the debtor to obtain postpetition credit or incur postpetition debt which entitles the postpetition lender to priming liens, a first-priority lien on unencumbered property of the debtor, and superpriority administrative expense status.  11 U.S.C. § 364(c)(1), (2), and (3).  A debtor seeking postpetition financing must make reasonable efforts to seek credit on an unsecured basis, but the debtor is granted deference by the court if the court finds the debtor acted within its business judgment when seeking out alternative sources of financing.  See, e.g., Bray v. Shenandoah Fed. Sav. & Loan Ass'n (In re Snowshoe Co.), 789 F.2d 1085 (4th Cir. 1986).  Moreover, a debtor is not required to exhaustively seek out every potential source of postpetition financing.  See id.; see also In re Mid-State Raceway, Inc., 323 B.R. 40, 58 (Bankr. N.D.N.Y. 2005); In re Baxco Corp., 148 B.R. 855, 860 (Bankr. N.D. Ill. 1992).

47.      The Debtor has negotiated in good faith and at arms-length with the Bond Trustee and the Bank and provided them with an opportunity to provide the debtor in possession financing but they have declined.  As noted above, the Debtor solicited potential financing from a number of financial institutions that are either participants in the letter of credit facility or holders of the Debtor's Bonds as well as from other third party lending institutions and strategic

investors.  The Debtor also negotiated in good faith and at arms-length with the DIP Lender.

The DIP Lender provided the Debtor with a financing facility having the best overall terms.

Accordingly, the Debtor's efforts to obtain necessary postpetition financing satisfy the

requirements of Bankruptcy Code section 364(c).

**C.      The Debtor Could Not Obtain Alternative Financing and the Bond Trustee's
         Interests Are Adequately Protected**

48.      Bankruptcy Code section 364(d) allows postpetition financing that provides a

postpetition lender a senior or equal lien on a debtor's encumbered property (a "priming" lien) if

(i) the debtor could not obtain alternative financing and (ii) the interests of the secured parties

whose security interests are being primed are adequately protected.  See 11 U.S.C. § 364(d)(1).

49.      Substantially all of the Debtor's assets are encumbered and, despite the diligent

efforts of the Debtor and its financial advisors, the Debtor has been unable to procure the

required funding absent the proposed super priority claims and priming lines.  The Debtor has

negotiated the best possible terms to obtain the funding they need to maintain sufficient liquidity

to preserve their assets over the course of this chapter 11 case, and the DIP Lender is unwilling

to provide the DIP Facility without the priming liens.  Accordingly, the first requirement of

Bankruptcy Code section 364(d)(1) is satisfied.

50.      Additionally, pursuant to the Interim Cash Collateral Order, the Bond Trustee's

security interests will be adequately protected.  Although the Bankruptcy Code does not define

what constitutes adequate protection, Bankruptcy Code section 361, lists three (3) nonexclusive

examples:  to the extent of any decrease in value if an entity's interest in property resulting from

the grant of a priming lien (i) a cash payment or periodic cash payments; (ii) an additional or

replacement lien; or (iii) "granting such other relief, other than entitling such entity to

compensation allowable under section 503(b)(1) of [the Bankruptcy Code] as an administrative

expense, as will result in the realization by such entity of the indubitable equivalent of such entity's interest in such property."   Whether the protection offered by a debtor is adequate protection is determined on a case-by-case basis.   See MNBank Dallas, N.A. v. O'Connor (In re O'Connor), 808 F.2d 1393, 1396 (10th Cir. 1987); Martin v. United States (In re Martin), 761 F.2d 472 (8th Cir. 1995).   Further, the adequate protection requirement is designed to protect a lienholder from the diminution of the value of its interest due to use of priming.   See In re Swedeland Dev. Group, Inc., 16 F.3d 552, 564 (3d Cir. 1994) ("The whole purpose of adequate protection for a creditor is to insure that the creditor receives the value for which he bargained prebankruptcy.") (internal citations omitted).

51.     The Bond Trustee has not objected to and is entitled, pursuant to Bankruptcy Code sections 361, 363(c)(2) and 363(e), to adequate protection of its interest in the prepetition collateral, which includes an agreement by the Debtor to reserve and not use cash on hand as of the Petition Date (estimated in the aggregate amount of $100,000), the granting of replacement liens on post-petition collateral subject to senior liens of the DIP Lender, and payment of the reasonable professional fees and expenses incurred by the Bond Trustee, the Bank and the Bondholders with respect to this Chapter 11 Case.   These protections are fair and reasonable and will protect the Bond Trustee from diminution in value of its interests in the Collateral.   Finally, the Bond Trustee and the Bank have consented to the DIP Facility.   Accordingly, the requirements for priming existing liens are duly satisfied.

52.     The Debtor has an emergency need for the immediate use of Cash Collateral and the DIP Financing to effectively and expeditiously manage this chapter 11 case.   Absent the use of Cash Collateral and the DIP Financing the Debtor will be forced to cease operations of its business, thereby jeopardizing the life and well-being of each resident currently living at The

Clare.   Such an abrupt cessation of the business would have devastating effects on these residents, would cause the residents to suffer immediate and irreparable harm, and would leave the CCRC in a complete state of disarray.   The residents are elderly and have, in many cases, invested a large portion of their total assets in order to live at The Clare.   Most, if not all, of the residents' meals are eaten at The Clare and often their day-to-day activities heavily rely on the CCRC.   Simply put, if The Clare were to cease operations, the lifestyle of its residents would be jeopardized.

**D.**      **The DIP Facility is Necessary to Preserve the Value of the Debtor's Estate**

53.      Given the nature of the Debtor's business, the residents', the employees' and the trade creditors' confidence in the viability of the enterprise is key to the Debtor's ability to continue operations without interruption.   Therefore, having the DIP Facility in place will assure the above-listed parties that the Debtor remains vital and have the working capital necessary to continue operations, including payroll and capital expenditures, during this case with the ultimate goal of preserving and maximizing the going concern value of the Debtor's business which will inure to the benefit of all creditor constituencies.

54.      The Debtor requires both the use of Cash Collateral and the financing proposed herein to continue to operate their business until consummation of a plan or implementation of a sale.   If the Debtor is unable, on a consistent basis, to maintain its business and demonstrate financial stability to existing and future residents, the CCRC will lose existing residents, employees, and vendors, will be unable to attract new residents and will be forced to cease operations.   This will not only cause harm to the Debtor, but it will also cause harm to the residents, who will not receive proper care and may be forced to move.   Therefore, postpetition

financing and the use of cash collateral is essential to the Debtor's continued ability to operate, to maintaining the value of its assets, and to the success of this chapter 11 case.

**E.**     **The DIP Facility Should Be Authorized as Fair and Reasonable and a Sound Exercise of the Debtor's Business Judgment**

55.     The terms and conditions of the DIP Facility are fair and reasonable and were negotiated by the Debtor and DIP Lender at arms-length and in good faith.  Additionally, the Carve-Out for professional fees is reasonable and necessary to ensure any statutory committee and the Debtor's estate may retain the assistance of outside counsel.  See Ames Dep't Stores, 115 B.R. at 38.

56.     Moreover, approval of the DIP Facility, along with the use of cash collateral, will provide the Debtor with immediate and ongoing access to funds to pay their current and ongoing operating expenses, including postpetition wages and salaries and vendor costs.  Unless these expenditures are made, the Debtor will be forced to cease operations, which would result in irreparable harm to the business, deplete going concern value, and jeopardize the Debtor's ability to reorganize.  Because cash collateral is insufficient to fund such expenditures, the credit provided under the DIP Facility is necessary to preserve and enhance the value of the estate for the benefit of all stakeholders.  Additionally, the availability of credit under the DIP Facility will provide confidence to the residents, employees, and trade vendors, thereby promoting a successful reorganization.  In addition, the party holding a security interest in substantially all of the Debtor's assets, the Bond Trustee as well as the Bank, have indicated that they do not oppose the use of cash collateral or the priming of the Bond Trustee's liens pursuant to the DIP Facility. Accordingly, the timely approval of the relief requested herein is imperative.

57.     The Debtor submits that the circumstances of this case require the Debtor to obtain financing under Bankruptcy Code sections 364(c) and (d), and accordingly, the DIP Facility reflects the exercise of sound business judgment.

**F.      Section 364(e) Protections Should Apply to the DIP Financing**

58.     The terms and conditions of the DIP Facility are fair and reasonable, and were negotiated extensively by well-represented, independent parties in good faith and at arms-length. Accordingly, the DIP Lender and all obligations incurred under the DIP Facility should be accorded the benefits of Bankruptcy Code section 364(e).

**G.      The Automatic Stay Should Be Modified on a Limited Basis**

59.     The relief requested herein contemplates a modification of the automatic stay pursuant to Bankruptcy Code section 362 to permit the DIP Lender to exercise, upon the occurrence and during the continuance of an Event of Default and, with respect to set off and other remedies in respect of the Collateral, after five (5) business days' notice thereof, all rights and remedies under the DIP Facility.  This kind of modification is an ordinary and standard feature of postpetition debtor in possession financing facilities and, in the Debtor's business judgment, is reasonable and fair under the present circumstances.

**H.      Interim Approval and Scheduling of Final Hearing**

60.     Bankruptcy Rules 4001(b) and (c) provide that a final hearing on a motion to obtain credit and use cash collateral pursuant to Bankruptcy Code section 364, respectively, may not be commenced earlier than fourteen (14) days after the service of such motion.  Upon request, however, the Court is empowered to conduct a preliminary expedited hearing on the motion and authorize the use of cash collateral and the obtaining of credit to the extent necessary to avoid immediate and irreparable harm to a debtor's estate pending a final hearing.

61.     Pursuant to Bankruptcy Rules 4001(b) and (c), the Debtor requests that the Court conduct an expedited preliminary hearing on this motion and (a) authorize the Debtor to borrow up to $2,500,000 under the DIP Facility and use cash collateral on an interim basis, pending entry of a Final Order, in order to (i) maintain and finance the ongoing operations of the Debtor and (ii) avoid immediate and irreparable harm and prejudice to the Debtor's estate and all parties in interest, and (b) schedule the Final Hearing.

62.     The Debtor needs cash to maintain proper liquidity levels and continue to operate. Without postpetition financing the Debtor will not have sufficient funds with which to operate their business on an ongoing basis during this chapter 11 case.  Absent authorization from the Court to obtain secured credit and use cash collateral, as requested, on an interim basis pending the Final Hearing the Debtor will be immediately and irreparably harmed.  Accordingly, the interim relief requested is critical to preserving and maintaining the going concern value of the Debtor and facilitating their reorganization efforts.

## I.     Waiver of Bankruptcy Rules 6004(a) and (h)

63.     The Debtor believes an efficient and expeditious approval and implementation of the DIP Facility is in the best interests of their creditors and other parties in interests. Accordingly, the Debtor seeks waiver of the notice requirements under Bankruptcy Rule 6004(a) and the 10-day stay of orders authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).

## Compliance with Local Rule 4001-2(A)(2)-(3)

64.     Local Rule 4001-2(A)(2)-(3) requires that certain provisions contained in the financing documents and/or Interim DIP Order be highlighted (the "Highlighted Provisions"), and that the Debtor must provide justification for the inclusion of such Highlighted Provisions. The Debtor used its best efforts to negotiate the elimination or limitation of the Highlighted

Provisions.  The Debtor, however, believes that certain provisions of the DIP Facility and/or Interim DIP Order include such Highlighted Provisions, but that such provisions are justified and necessary in the context and circumstances of this case.  Indeed, the Debtor has an immediate need to obtain the DIP Financing and use the Cash Collateral to ensure, *inter alia*, that the Debtor has sufficient working capital and liquidity and can preserve and maintain the going concern value of the Debtor's estate.  The Highlighted Provisions are required by the DIP Lender to obtain such DIP Financing and accomplish these goals.  In addition, the Highlighted Provisions are not uncommon in debtor in possession financing arrangements.  Accordingly, the Debtor believes that the aforementioned circumstances demonstrate that such extraordinary relief is necessary and appropriate and should be authorized and approved by the Court under Local Rule 4001-2.

65.   <u>Findings of Fact With Respect to Prepetition Liens</u>.  Pursuant to Local Rule 4001(A)(2)(b), a movant is required to describe whether the provisions of the proposed form of order include findings of fact that bind the estate or all parties in interest with respect to the validity, perfection or amount of the secured creditor's pre-petition lien or debt.  Here, paragraph 6 of the Interim DIP Order contains certain findings of fact regarding the validity, perfection or amount of the Bond Trustee's pre-petition collateral.  The Debtor asserts that thes provisions are appropriate under the circumstances.  In particular, this language is not uncommon in debtor-in-possession financings and was insisted upon by the Bond Trustee and the Bank in order for the Debtor to use the Cash Collateral.

66.   <u>Section 506(c) Waiver</u>.  Pursuant to Local Rule 4001-2(A)(2)(c), a movant is required to describe whether the provisions of the proposed debtor-in-possession facility waive any rights the estate may have under section 506(c) of the Bankruptcy Code.  Here, pursuant to

paragraph 7 of the Interim DIP Order, no section 506(c) claim may be charged against the DIP

Lender or the Collateral without the consent of the DIP Agent.  The Debtor asserts that this

provisions is appropriate under the circumstances.  The Debtor asserts that waivers of this sort

are not uncommon in debtor-in-possession financings and was insisted upon by the DIP Lender

in order to obtain the DIP Financing.

67.    <u>Automatic Stay</u>.  Pursuant to Local Rule 4001-2(A)(2)(i), a movant is required to

describe whether the provisions of the proposed debtor-in-possession facility grant the lender

relief from the automatic stay without further order of the court.  The Interim DIP Order and the

Interim Cash Collateral Order provides the DIP Lender such relief (e.g. see paragraphs 6(c) and

13(a) of the Interim DIP Order and paragraph 14 of the Cash Collateral Order).  However, the

Debtor asserts that such relief is appropriate under the facts and circumstances of this Chapter 11

Case.  Section 362 of the Bankruptcy Code provides for an automatic stay upon the filing of a

bankruptcy petition pursuant to the Bankruptcy Code.  The DIP Loan Agreement contemplates

(e.g., see Section 10.2 of the DIP Loan Agreement), upon occurrence of an event of default,

modification of the automatic stay to:  (i) permit the termination of the Debtor's authority to use

cash collateral, the acceleration of all obligations under the DIP Facility, the termination of all

commitments under the DIP Facility, and the exercise of other post-default remedies under the

DIP Loan Agreement and (ii) permit the DIP Lender to exercise enforcement remedies with

respect to collateral under the DIP Loan Agreement.  The DIP Loan Agreement provides that the

enforcement remedies against the collateral will require five business days notice to the Debtor,

the Bond Trustee, the Bank, counsel to any creditors' committee, and the United States Trustee.

Additionally, the Cash Collateral Order provides that the automatic stay extant under section

362(a) of the Bankruptcy Code shall be modified to the extent necessary to permit (i) the Master

Trustee and the Applicable Prepetition Lenders to apply payments made pursuant to the Interim

Cash Collateral Order in accordance with the terms and provisions of Interim Cash Collateral

Order and (ii) the Master Trustee and the Applicable Prepetition Lenders to send the Termination

Notice (as defined herein) and exercise any rights and remedies set forth herein.   Stay

modification provisions of this kind are ordinary and standard features of postpetition debtor-in-

possession financing facilities and cash collateral orders, and in the Debtor's business judgment,

are reasonable under the present circumstances.   What is more, these provisions are required by

the DIP Lender to obtain the DIP Financing and the Bond Trustee and Bank to use the Cash

Collateral.

### Notice

68.     Notice of the Motion has been given to (a) the Office of the United States Trustee

for the Northern District of Illinois, (b) counsel for Bank of America, N.A., as letter of credit

provider, (c) counsel for Bank of New York Mellon Trust Company, N.A., the indenture trustee,

(d) each of the Debtor's twenty (20) largest creditors, and (e) any party filing a notice of

appearance in this Chapter 11 Case.   In light of the nature of relief requested, the Debtor submits

that no further notice is required.

WHEREFORE the Debtor respectfully request that the Court enter the proposed interim orders, substantially in the form annexed hereto, granting the relief requested in the Motion and such other and further relief as may be just and proper.

Dated: November 15, 2011
      Chicago, Illinois

/s/ *Matthew M. Murphy*
Matthew M. Murphy (ARDC No. 06208157)
DLA PIPER LLP (US)
203 North LaSalle Street, Suite 1900
Chicago, Illinois 60601
Telephone:  (312) 368-4000
Facsimile:   (312) 236-7516

Thomas R. Califano, NY Bar No. 2286144
George B. South III, NY Bar No. 2446771
DLA PIPER LLP (US)
1251 Avenue of the Americas
New York, New York  10020-1104
Telephone:  (212) 335-4500
Facsimile:   (212) 335-4501

*Proposed Attorneys for The Clare at Water Tower Debtor and Debtor in Possession*