**UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| The Clare at Water Tower, | ) | Case No. 11-46151 |
| | ) | |
| Debtor. | ) | Hon. Susan Pierson Sonderby |

## FINAL ORDER AUTHORIZING USE OF CASH COLLATERAL AND PROVIDING ADEQUATE PROTECTION UNDER 11 U.S.C. §§ 105, 361, AND 363

This matter having come before the Court upon the motion dated November 15, 2011 (the "Motion")[1] of the debtor in possession in the above-captioned case (the "Debtor") for entry of an interim order and a final order (this "Final Order"), under sections 105, 361, 362 and 363 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 4001-2 of the Local Rules for the United States Bankruptcy Court for the Northern District of Illinois (the "Local Rules"), (i) authorizing the Debtor to utilize cash collateral, (ii) granting adequate protection to the Prepetition Lenders, and (iii) scheduling a final hearing on the Motion; and upon the interim hearing on the relief requested in the Motion on an interim basis conducted by the Court on November 16, 2011 (the "Interim Hearing"); and upon the Interim Order Authorizing Use of Cash Collateral and Providing Adequate Protection under 11 U.S.C. §§ 105, 361, and 363 (the "Interim Order") entered by the Court on November 17, 2011 following the conclusion of the Interim Hearing; and upon the final hearing on the Motion that took place on

---

[1]   Each capitalized term used but not defined herein shall have the meaning ascribed to it in the Motion.

December 20, 2011 (the "Final Hearing" and, collectively with the Interim Hearing, the "Hearing"); and upon the record herein and at the Hearing; and after due deliberation thereon; and good and sufficient cause appearing therefor,

IT IS HEREBY FOUND AND ORDERED THAT:

1.    Petition Date. On November 14, 2011 (the "Petition Date"), the Debtor initiated a case by filing a voluntary petition for relief under chapter 11 of the Bankruptcy Code (the "Chapter 11 Case"). The Debtor is now operating its business and managing its properties as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No request has been made for the appointment of a trustee or examiner. On December 1, 2011, the Office of the United States Trustee appointed an official committee of unsecured creditors (the "Committee") in connection with the Chapter 11 Case.

2.    Jurisdiction. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

3.    Loan Documents.

(a)    The Debtor acknowledges that it is obligated under that or those certain:

(i) Master Trust Indenture dated July 1, 2010 (as supplemented and amended from time to time, the "Master Indenture") with The Bank of New York Mellon Trust Company, N.A. ("BNY" and, in its capacity as master trustee under the Master Indenture, the "Master Trustee") acting as Master Trustee for the holders of the Fixed Rate Claims (as defined herein) and the Variable Rate Claims (as defined herein) (collectively with the Master Trustee, the "Prepetition Lenders");

2

CHI:2599082.16

(ii) Certain "Master Notes" (as defined in the Master Indenture) made by the Debtor pursuant to the Master Indenture;

(iii) Leasehold Mortgage and Security Agreement dated as of November 2, 2005 by and between the Debtor, as mortgagor, and the Master Trustee, as mortgagee, filed with the Cook County, Illinois, Recorder of Deeds as Document Number 0534805196 (as amended, restated, modified or supplemented, the "Mortgage")

(iv) (I) Revenue Refunding Bonds, Series 2010A (The Clare at Water Tower) in the original aggregate principal amount of $61,253,500 (the "Series 2010A Bonds") and (II) Revenue Refunding Bonds, Series 2010B (The Clare at Water Tower) in the original aggregate principal amount of $26,251,500 (the "Series 2010B Bonds," and collectively with the Series 2010A Bonds, the "Series 2010 Bonds") issued pursuant to a Bond Trust Indenture (with respect to the Series 2010 Bonds) dated as of July 1, 2010 (the "2010 Fixed Rate Bond Indenture") by and between the Illinois Finance Authority (the "Issuer") and Wells Fargo Bank, National Association (as successor to The Bank of New York Mellon Trust Company, N.A. (as successor to J.P. Morgan Trust Company, National Association)) (in its capacity as trustee for the Series 2010 Bonds, the "2010 Fixed Rate Bond Trustee");

(v) (I) Revenue Bonds, Series 2005A ( The Clare at Water Tower Project) in the original aggregate principal amount of $74,000,000 (the "Series 2005A Bonds"); (II) Revenue Bonds, Series 2005B-1 (The Clare at Water Tower Project) Extendable Rate Adjustable Securities$^{SM}$ (EXTRAS$^{SM}$) in the original aggregate principal amount of $4,000,000 (the "Series 2005B-1 Bonds"); (III) Revenue Bonds, Series 2005B-2 (The Clare at Water Tower Project) Extendable Rate Adjustable Securities$^{SM}$ (EXTRAS$^{SM}$) in the original aggregate

3

principal amount of $6,000,000 (the "Series 2005B-2 Bonds," and, collectively with the Series 2005B-1 Bonds, the "Series 2005B Bonds"); and (IV) Revenue Bonds, Series 2005C (The Clare at Water Tower Project) in the original aggregate principal amount of $7,500,000 (the "Series 2005C Bonds," and, collectively with the Series 2005A Bonds and the Series 2005B Bonds, the "2005 Fixed Rate Bonds" and, collectively with the Series 2010 Bonds, the "Fixed Rate Bonds"), each such series issued pursuant to a Bond Trust Indenture (with respect to the 2005 Fixed Rate Bonds) dated as of November 1, 2005 (the "2005 Fixed Rate Bond Indenture" and, collectively with the 2010 Fixed Rate Bond Indenture, the "Fixed Rate Bond Indentures") by and between the Issuer and The Bank of New York Mellon Trust Company, N.A. (as successor to J.P. Morgan Trust Company, National Association) (in its capacity as the 2005 Fixed Rate Bond Trustee under the 2005 Fixed Rate Bonds, the "2005 Fixed Rate Bond Trustee" and, collectively with the 2010 Fixed Rate Bond Trustee, the "Fixed Rate Bond Trustee");

(vi) Variable Rate Demand Revenue Bonds, Series 2005D (The Clare at Water Tower Project), in the original aggregate principal amount of $125,000,000 (the "Series 2005D Bonds") issued pursuant to a Bond Trust Indenture (with respect to the Series 2005D Bonds) dated as of November 1, 2005 (as amended, reaffirmed, restated, modified or supplemented, at times and from time to time, the "Authority Variable Rate Indenture") by and between the Issuer and The Bank of New York Mellon Trust Company, N.A. (as successor to J.P. Morgan Trust Company, National Association) (in its capacity as the Series 2005D Bond trustee under the Series 2005D Bonds, the "Authority Variable Rate Bond Trustee");

(vii) Taxable Variable Rate Demand Revenue Bonds, Series 2005E (The Clare at Water Tower Project), in the original aggregate principal amount of $12,500,000 (the "Series 2005E Bonds," and, collectively with the Series 2005D Bonds, the "Variable Rate

4

Bonds") issued pursuant to a Bond Trust Indenture (with respect to the Series 2005E Bonds) dated as of November 1, 2005 (as amended, restated, modified or supplemented, at times and from time to time, the "Borrower Variable Rate Indenture" and, collectively with the Authority Variable Rate Indenture, the "Variable Rate Bond Indenture) by and between the Debtor and The Bank of New York Mellon Trust Company, N.A. (as successor to J.P. Morgan Trust Company, National Association) (in its capacity as the Series 2005E Bond trustee under the Series 2005E Bonds, the "Borrower Variable Rate Bond Trustee" and, collectively with the Authority Variable Rate Bond Trustee, the "Variable Rate Bond Trustee);

(viii) Loan Agreement dated as of July 1, 2010 (the "2010 Fixed Rate Loan Agreement") by and between the Debtor and the Issuer, pursuant to which the Debtor covenanted to make payments at such times and in such amounts (including principal, interest and premium, if any) so as to provide for the payment of the principal of, premium, if any, and interest on the Series 2010 Bonds outstanding under the 2010 Fixed Rate Bond Indenture;

(ix) (I) the Loan Agreement dated as of November 1, 2005 by and between the Debtor and the Issuer (as amended, reaffirmed, restated, modified or supplemented, at times and from time to time, the "2005 Fixed Rate Loan Agreement" and, collectively with the Fixed Rate Bond Indentures, the Series 2010 Bonds and the 2005 Fixed Rate Bonds, the "Fixed Rate Loan Documents" and any claim arising out of or related to the Fixed Rate Loan Documents, a "Fixed Rate Claim"), pursuant to which the Debtor covenanted to make payments at such times and in such amounts (including principal, interest and premium, if any) so as to provide for the payment of the principal of, premium, if any, and interest on the 2005 Fixed Rate Bonds outstanding under the 2005 Fixed Rate Bond Indenture, and (II) the Loan Agreement dated as of November 1, 2005 by and between the Debtor and the Issuer (as amended, reaffirmed, restated, modified or

5

supplemented, at times and from time to time, the "Variable Rate Loan Agreement"), pursuant to which the Debtor covenanted to make payments at such times and in such amounts (including principal, interest and premium, if any) so as to provide for the payment of the principal of, premium, if any, and interest on the Variable Rate Bonds outstanding under the Variable Rate Bond Indentures;

(x)   Letter of Credit Agreement with a maximum commitment of $138,979,453 dated as of November 1, 2005, by and between the Debtor, as borrower, and Bank of America, N.A. ("BAC"), as issuer of two separate direct pay letters of credit (the "Letters of Credit") each securing one of the series of the Variable Rate Bonds, with draws under such Letters of Credit further secured by a first priority pledge of all of the Variable Rate Bonds (as amended from time to time, the "Reimbursement Agreement," and, collectively with the Variable Rate Bonds, the Variable Rate Bond Indentures and the Variable Rate Loan Agreement, the "Variable Rate Loan Documents" and any claim arising out of or related to the Variable Rate Loan Documents, a "Variable Rate Claim," and the Variable Rate Loan Documents, collectively with the Fixed Rate Loan Documents, the Master Notes, the Mortgage and the related pledge and security agreements (including, without limitation, that certain Pledge and Security Agreement with respect to the Series 2005D Bonds dated November 1, 2005 by and among The Bank of New York Mellon Trust Company, N.A. (as successor to J.P. Morgan Trust Company, National Association), the Debtor and BAC and that certain Pledge and Security Agreement with respect to the Series 2005E Bonds dated November 1, 2005 by and among The Bank of New York Mellon Trust Company, N.A. (as successor to J.P. Morgan Trust Company, National Association), the Debtor and BAC), mortgages, deeds of trust, security documents, consent and agreement documents, and other loan documentation related thereto, the "Prepetition Credit

6

Documents"). On September 20, 2011, BAC issued a notice of event of default to the Variable Rate Bond Trustee of the Series 2005D Bonds and Series 2005E Bonds with respect to an event of default occurring under the Reimbursement Agreement (the "Event of Default Notice"), which Event of Default Notice directed, in accordance with the terms and conditions of the Prepetition Credit Documents, a mandatory tender of the Series 2005D Bonds and the Series 2005E Bonds (the "Variable Rate Bonds Mandatory Tender").

(b)     The holders of a majority in principal amount of the Fixed Rate Claims (the "Applicable Fixed Rate Claim Holders"), all of the holders of the Variable Rate Claims (collectively, the "Applicable Prepetition Lenders"), and the Master Trustee have advised the Court that they decline to object to the terms of the Final DIP Order or the use of Cash Collateral (as defined herein) in accordance with the terms of this Final Order.

(c)     Pursuant to the Prepetition Credit Documents, certain accounts were established and are held by the Master Trustee, the Fixed Rate Bond Trustee and/or the Variable Rate Bond Trustee (collectively, the "Trustee-Held Funds"), including, but not limited to, (i) redemption funds, (ii) interest funds, (iii) tax funds (including, without limitation, the "Pre-Opening Tax Escrow Account" and the "Property Tax Escrow Account", each as defined under the Maser Indenture), (iv) sinking funds, (v) project funds and (vi) debt service reserve funds.

(d)     Pursuant to the Master Indenture and the Mortgage, the Debtor granted to the Master Trustee, for the benefit of the Prepetition Lenders, first-priority security interests in and liens upon (collectively, the "Prepetition Secured Liens"), inter alia, (i) all "Gross Revenues" of the Obligated Group Members (as defined in the Master Indenture), (ii) the Mortgaged Premises (as

7

defined in the Mortgage), and (iii) all of the machinery, equipment, furniture, spare parts and other personal property (collectively, the "Prepetition Collateral").

4.    DIP Financing.  As set forth in that certain debtor-in-possession financing motion filed by the Debtor on the Petition Date (Docket No. 26, the "DIP Motion"), Redwood Capital Investments, LLC (the "DIP Lender") has provided and will continue to provide a debtor-in-possession financing facility (the "DIP Financing") to the Debtor on the terms and conditions set forth in that certain final order dated as of December 21, 2011 pertaining to the DIP Financing (the "Final DIP Order") and in that certain debtor-in-possession credit agreement (together with all documents, agreements and certificates related thereto, the "DIP Credit Agreement" and, collectively with the Final DIP Order, the "Final DIP Documents").  The Debtor, the DIP Lender, the Master Trustee and the Applicable Prepetition Lenders have agreed for purposes of this Final Order that the schedule of revenues and expenditures (the "Budget") that is current under the terms of the Final DIP Order and the Final DIP Documents shall apply to the use of Cash Collateral (as defined herein) under this Final Order and to the DIP Financing pursuant to the terms and conditions set forth herein (including, without limitation, Section 9 hereof) and in the Final DIP Documents.  A copy of the Budget as of the date hereof is attached hereto as Exhibit A.

5.    Certain Findings.

(a)    A need exists for the Debtor to be permitted access to funds in order to continue to operate its business.  Without such funds, the Debtor will not be able to pay its direct operating expenses.  As a result, there is a risk that the going concern value of the Debtor's business will decline if it cannot make use of Cash Collateral (as defined herein), in which case the Debtor, its estate, and its stakeholders will be harmed.

8

(b)     The Debtor requires cash on hand to fund this Chapter 11 Case and to successfully reorganize. All of the Debtor's deposit accounts, cash and cash proceeds are encumbered by security interests in favor of the Master Trustee and, as such, constitute "cash collateral" (as such term is defined in section 363(a) of the Bankruptcy Code) of the Master Trustee.

(c)     The Debtor has a need for the use of Cash Collateral to effectively and expeditiously manage this Chapter 11 Case. Absent the use of Cash Collateral (in addition to the DIP Financing), the Debtor would be forced to cease operations of its business. Such an abrupt cessation of the Debtor's business would have devastating effects on the residents of The Clare at Water Tower, would cause the residents to suffer harm, and would leave the Debtor in a complete state of disarray.

(d)     As set forth in the Interim Order, notice of the Interim Hearing and the relief requested in the Motion on an interim basis provided by the Debtor constituted due and sufficient notice of the relief requested in the Motion on an interim basis and of the Interim Hearing. On November 17, 2011, the Debtor filed and served on the parties listed therein that certain Certificate of Service of the entry of the Interim Order (Docket No. 97). Accordingly, notice of the entry of the Interim Order, the Final Hearing and the relief requested in the Motion provided by the Debtor constitutes due and sufficient notice of the Motion and of the Final Hearing.

(e)     Good cause has been shown for the entry of this Final Order. Among other things, entry of this Final Order will minimize disruption of the Debtor's business and operations and permit it to meet operating expenses. The Cash Collateral use arrangement authorized hereunder is vital to avoid immediate and irreparable harm to the Debtor's estate.

9

Absent the use of the Cash Collateral, the Debtor's estate would not have necessary funds to satisfy its obligations. Allowing the use of Cash Collateral therefore is in the best interests of the Debtor's estate and creditors.

(f)      The Cash Collateral use and adequate protection arrangements authorized hereunder, and the terms of such Cash Collateral use and adequate protection arrangements, are fair and reasonable under the circumstances, reflect the Debtor's exercise of prudent business judgment and are supported by reasonably equivalent value and fair consideration.

(g)      The Court concludes that entry of this Final Order is in the best interests of the Debtor, its estate and its creditors as its implementation will allow for the continued operation of the Debtor's existing business.

6.      <u>Fixed Rate Bonds Stipulations</u>.

I.      <u>Series 2010A Bonds</u>.  The Debtor has stipulated and agreed that:

(a)      pursuant to the Series 2010A Bonds and the related Fixed Rate Loan Documents, as of the date hereof, the Debtor was truly and justly indebted and liable to the holders of the Series 2010A Bonds, without defense, counterclaim, or offset of any kind, in the aggregate principal amount of approximately $61,253,500.00 with respect to the Series 2010A Bonds and the related Fixed Rate Loan Documents in respect of loans made by the holders of the Series 2010A Bonds for the account of the Debtor pursuant to the Series 2010A Bonds and the related Fixed Rate Loan Documents, together with accrued or accruing interest thereon plus fees, costs and expenses incurred in connection therewith as provided in the Series

10

2010A Bonds and the related Fixed Rate Loan Documents (the "Series 2010A Bonds Fixed Rate Debt");

(b)    the Series 2010A Bonds Fixed Rate Debt is not subject to subordination or recharacterization for any reason;

(c)    the Prepetition Secured Liens of the Master Trustee for the benefit of holders of the Series 2010A Bonds are valid, duly authorized, perfected, enforceable, non-voidable, first-priority (subject to the DIP Lender's Liens (as defined herein)) liens and security interests in the Prepetition Collateral; and

(d)    the Trustee-Held Funds are not property of the Debtor's estate, are not collateral to secure the repayment of the Debtor's obligations with respect to the DIP Financing, are not encumbered by the liens granted to the DIP Lender and are held in trust for the benefit of the holders of the Series 2010A Bonds as set forth in the Series 2010A Bonds and the related Fixed Rate Loan Documents and for the express purposes set forth in the Fixed Rate Loan Documents and shall not be used or made available to the Debtor as Cash Collateral or otherwise pursuant to this Final Order or any other order entered in this case.

II.    Series 2010B Bonds.  The Debtor has stipulated and agreed that:

(a)    pursuant to the Series 2010B Bonds and the related Fixed Rate Loan Documents and as of the date hereof, the Debtor was truly and justly indebted and liable to the holders of Series 2010B Bonds, without defense, counterclaim, or offset of any kind, in the aggregate principal amount of approximately $26,251,500.00 with respect to the Series 2010B Bonds and the related Fixed Rate Loan Documents in respect of loans made by the

11

holders of the Series 2010B Bonds for the account of the Debtor pursuant to the Series 2010B

Bonds and the related Fixed Rate Loan Documents, together with accrued or accruing interest

thereon plus fees, costs and expenses incurred in connection therewith as provided in the Series

2010B Bonds and the related Fixed Rate Loan Documents (the "Series 2010B Bonds Fixed

Rate Debt");

(b)    the Series 2010B Bonds Fixed Rate Debt is not subject to subordination or

recharacterization for any reason;

(c)    the Prepetition Secured Liens of the Master Trustee for the benefit of

holders of the Series 2010B Bonds are valid, duly authorized, perfected, enforceable, non-

voidable, first-priority (subject to the DIP Lender's Liens) liens and security interests in the

Prepetition Collateral; and

(d)    the Trustee-Held Funds are not property of the Debtor's estate, are not

collateral to secure the repayment of the Debtor's obligations with respect to the DIP Financing,

are not encumbered by the liens granted to the DIP Lender and are held in trust for the benefit of

the holders of the Series 2010B Bonds as set forth in the Series 2010B Bonds and the related

Fixed Rate Loan Documents and for the express purposes set forth in the Fixed Rate Loan

Documents and shall not be used or made available to the Debtor as Cash Collateral or otherwise

pursuant to this Final Order or any other order entered in this case.

III.    Series 2005A Bonds.  The Debtor has stipulated and agreed that:

(a)    pursuant to the Series 2005A Bonds and the related Fixed Rate Loan

Documents and as of the date hereof, the Debtor was truly and justly indebted and liable to

12

the holders of Series 2005A Bonds, without defense, counterclaim, or offset of any kind, in the aggregate principal amount of approximately $2,170,000.00 with respect to the Series 2005A Bonds and the related Fixed Rate Loan Documents in respect of loans made by the holders of the Series 2005A Bonds for the account of the Debtor pursuant to the Series 2005A Bonds and the related Fixed Rate Loan Documents, together with accrued or accruing interest thereon plus fees, costs and expenses incurred in connection therewith as provided in the Series 2005A Bonds and the related Fixed Rate Loan Documents (the "Series 2005A Bonds Fixed Rate Debt");

(b)    the Series 2005A Bonds Fixed Rate Debt is not subject to subordination or recharacterization for any reason;

(c)    the Prepetition Secured Liens of the Master Trustee for the benefit of holders of the Series 2005A Bonds are valid, duly authorized, perfected, enforceable, non-voidable, first-priority (subject to the DIP Lender's Liens) liens and security interests in the Prepetition Collateral; and

(d)    the Trustee-Held Funds are not property of the Debtor's estate, are not collateral to secure the repayment of the Debtor's obligations with respect to the DIP Financing, are not encumbered by the liens granted to the DIP Lender and are held in trust for the benefit of the holders of the Series 2005A Bonds as set forth in the Series 2005A Bonds and the related Fixed Rate Loan Documents and for the express purposes set forth in the Fixed Rate Loan Documents and shall not be used or made available to the Debtor as Cash Collateral or otherwise pursuant to this Final Order or any other order entered in this case.

IV.    <u>Series 2005B-1 Bonds</u>.  The Debtor has stipulated and agreed that:

(a)    pursuant to the Series 2005B-1 Bonds and the related Fixed Rate Loan Documents and as of the date hereof, the Debtor was truly and justly indebted and liable to the holders of Series 2005B-1 Bonds, without defense, counterclaim, or offset of any kind, in the aggregate principal amount of approximately $580,000.00 with respect to the Series 2005B-1 Bonds and the related Fixed Rate Loan Documents in respect of loans made by the holders of the Series 2005B-1 Bonds for the account of the Debtor pursuant to the Series 2005B-1 Bonds and the related Fixed Rate Loan Documents, together with accrued or accruing interest thereon plus fees, costs and expenses incurred in connection therewith as provided in the Series 2005B-1 Bonds and the related Fixed Rate Loan Documents (the "<u>Series 2005B-1 Bonds Fixed Rate Debt</u>");

(b)    the Series 2005B-1 Bonds Fixed Rate Debt is not subject to subordination or recharacterization for any reason;

(c)    the Prepetition Secured Liens of the Master Trustee for the benefit of holders of the Series 2005B-1 Bonds are valid, duly authorized, perfected, enforceable, non-voidable, first-priority (subject to the DIP Lender's Liens) liens and security interests in the Prepetition Collateral; and

(d)    the Trustee-Held Funds are not property of the Debtor's estate, are not collateral to secure the repayment of the Debtor's obligations with respect to the DIP Financing, are not encumbered by the liens granted to the DIP Lender and are held in trust for the benefit of the holders of the Series 2005B-1 Bonds as set forth in the Series 2005B-1 Bonds and the related Fixed Rate Loan Documents and for the express purposes set forth in the related Fixed

14

Rate Loan Documents shall not be used or made available to the Debtor as Cash Collateral or otherwise pursuant to this Final Order or any other order entered in this case.

V.    Series 2005B-2 Bonds. The Debtor has stipulated and agreed that:

(a)    pursuant to the Series 2005B-2 Bonds and the related Fixed Rate Loan Documents and as of the date hereof, the Debtor was truly and justly indebted and liable to the holders of Series 2005B-2 Bonds, without defense, counterclaim, or offset of any kind, in the aggregate principal amount of approximately $700,000.00 with respect to the Series 2005B-2 Bonds and the related Fixed Rate Loan Documents in respect of loans made by the holders of the Series 2005B-2 Bonds for the account of the Debtor pursuant to the Series 2005B-2 Bonds and the related Fixed Rate Loan Documents, together with accrued or accruing interest thereon plus fees, costs and expenses incurred in connection therewith as provided in the Series 2005B-2 Bonds and the related Fixed Rate Loan Documents (the "Series 2005B-2 Bonds Fixed Rate Debt");

(b)    the Series 2005B-2 Bonds Fixed Rate Debt is not subject to subordination or recharacterization for any reason;

(c)    the Prepetition Secured Liens of the Master Trustee for the benefit of holders of the Series 2005B-2 Bonds are valid, duly authorized, perfected, enforceable, non-voidable, first-priority (subject to the DIP Lender's Liens) liens and security interests in the Prepetition Collateral; and

(d)    the Trustee-Held Funds are not property of the Debtor's estate, are not collateral to secure the repayment of the Debtor's obligations with respect to the DIP Financing,

15

are not encumbered by the liens granted to the DIP Lender and are held in trust for the benefit of the holders of the Series 2005B-2 Bonds as set forth in the Series 2005B-2 Bonds and the related Fixed Rate Loan Documents and for the express purposes set forth in the Fixed Rate Loan Documents and shall not be used or made available to the Debtor as Cash Collateral or otherwise pursuant to this Final Order or any other order entered in this case.

VI.   <u>Series 2005C Bonds</u>.  The Debtor has stipulated and agreed that:

(a)    pursuant to the Series 2005C Bonds and the related Fixed Rate Loan Documents and as of the date hereof, the Debtor was truly and justly indebted and liable to the holders of Series 2005C Bonds, without defense, counterclaim, or offset of any kind, in the aggregate principal amount of approximately $540,000.00 with respect to the Series 2005C Bonds and the related Fixed Rate Loan Documents in respect of loans made by the holders of the Series 2005C Bonds for the account of the Debtor pursuant to the Series 2005C Bonds and the related Fixed Rate Loan Documents, together with accrued or accruing interest thereon plus fees, costs and expenses incurred in connection therewith as provided in the Series 2005C Bonds and the related Fixed Rate Loan Documents (the "<u>Series 2005C Bonds Fixed Rate Debt</u>" and, together with the Series 2005A Bonds Fixed Rate Debt, Series 2005B-1 Bonds Fixed Rate Debt, Series 2005B-2 Bonds Fixed Rate Debt, Series 2010 A Bonds Fixed Rate Debt and Series 2010B Bonds Fixed Rate Debt, the "<u>Prepetition Fixed Rate Debt</u>");

(b)    the Series 2005C Bonds Fixed Rate Debt is not subject to subordination or recharacterization for any reason;

(c)    the Prepetition Secured Liens of the Master Trustee for the benefit of holders of the Series 2005C Bonds are valid, duly authorized, perfected, enforceable, non-

16

voidable, first-priority (subject to the DIP Lender's Liens) liens and security interests in the Prepetition Collateral; and

(d)    the Trustee-Held Funds are not property of the Debtor's estate, are not collateral to secure the repayment of the Debtor's obligations with respect to the DIP Financing, are not encumbered by the liens granted to the DIP Lender and are held in trust for the benefit of the holders of the Series 2005C Bonds as set forth in the Fixed Rate Loan Documents and for the express purposes set forth in the 2005C Bonds and the related Fixed Rate Loan Documents and shall not be used or made available to the Debtor as Cash Collateral or otherwise pursuant to this Final Order or any other order entered in this case.

7.    <u>Variable Rate Bonds Stipulations</u>.

I.    <u>Series 2005D Bonds</u>.  The Debtor has stipulated and agreed that:

(a)    pursuant to the Series 2005D Bonds and the related Variable Rate Loan Documents and as of the date hereof, the Debtor was truly and justly indebted and liable to the holders of the Series 2005D Bonds, without defense, counterclaim, or offset of any kind, in the aggregate principal amount of approximately $125,000,000.00 with respect to the Series 2005D Bonds and the related Variable Rate Loan Documents, in respect of loans made by the holders of the Series 2005D Bonds and letters of credit issued by the holders of the Series 2005D Bonds for the account of the Debtor pursuant to the Series 2005D Bonds and the related Variable Rate Loan Documents, together with accrued or accruing interest thereon plus fees, costs and expenses incurred in connection therewith as provided in the Series 2005D Bonds and the related Variable Rate Loan Documents (the "<u>Series 2005D Bonds Variable Rate Debt</u>");

17

(b)    the Series 2005D Bonds Variable Rate Debt is not subject to subordination or recharacterization for any reason;

(c)    the Prepetition Secured Liens of the Master Trustee for the benefit of holders of the Series 2005D Bonds are valid, duly authorized, perfected, enforceable, non-voidable, first-priority (subject to the DIP Lender's Liens) liens and security interests in the Prepetition Collateral; and

(d)    the Trustee-Held Funds are not property of the Debtor's estate, are not collateral to secure the repayment of the Debtor's obligations with respect to the DIP Financing, are not encumbered by the liens granted to the DIP Lender and are held in trust for the benefit of the holders of the Series 2005D Bonds as set forth in the Series 2005D Bonds and the related Variable Rate Loan Documents and for the express purposes set forth in the Variable Rate Loan Documents and shall not be used or made available to the Debtor as Cash Collateral or otherwise pursuant to this Final Order or any other order entered in this case.

II.    <u>Series 2005E Bonds</u>.  The Debtor has stipulated and agreed that:

(a)    pursuant to the Series 2005E Bonds and the related Variable Rate Loan Documents and as of the date hereof, the Debtor was truly and justly indebted and liable to the holders of the Series 2005E Bonds, without defense, counterclaim, or offset of any kind, in the aggregate principal amount of approximately $12,500,000.00 with respect to the Series 2005E Bonds and the related Variable Rate Loan Documents, in respect of loans made by the holders of the Series 2005E Bonds and letters of credit issued by the holders of the Series 2005E Bonds for the account of the Debtor pursuant to the Series 2005E Bonds and the related Variable Rate Loan Documents, together with accrued or accruing interest thereon plus

18

fees, costs and expenses incurred in connection therewith as provided in the Series 2005E Bonds

and the related Variable Rate Loan Documents (the "Series 2005E Bonds Variable Rate Debt");

(b)    the Series 2005E Bonds Variable Rate Debt is not subject to subordination

or recharacterization for any reason;

(c)    the Prepetition Secured Liens of the Master Trustee for the benefit of

holders of the Series 2005E Bonds are valid, duly authorized, perfected, enforceable, non-

voidable, first-priority (subject to the DIP Lender's Liens) liens and security interests in the

Prepetition Collateral; and

(d)    the Trustee-Held Funds are not property of the Debtor's estate, are not

collateral to secure the repayment of the Debtor's obligations with respect to the DIP Financing,

are not encumbered by the liens granted to the DIP Lender and are held in trust for the benefit of

the holders of the Series 2005E Bonds as set forth in the Series 2005E Bonds and the related

Variable Rate Loan Documents and for the express purposes set forth in the Variable Rate Loan

Documents and shall not be used or made available to the Debtor as Cash Collateral or otherwise

pursuant to this Final Order or any other order entered in this case.

III.    Reimbursement Agreement.    The Debtor has stipulated and agreed that:

(a)    pursuant to the Reimbursement Agreement and the related Variable

Rate Loan Documents and as of the date hereof, the Debtor was truly and justly indebted to

BAC, without defense, counterclaim, or offset of any kind, in the aggregate principal amount

of approximately $137,500,000.00 with respect to the Reimbursement Agreement and the

related Variable Rate Loan Documents, in respect of loans made by BAC and the Letters of

19

Credit issued by BAC for the account of the Debtor pursuant to the Reimbursement Agreement and the related Variable Rate Loan Documents, together with accrued or accruing interest thereon plus fees, costs and expenses incurred in connection therewith as provided in the Reimbursement Agreement and the related Variable Rate Loan Documents (the "Reimbursement Agreement Variable Rate Debt" and, together with the Series 2005E Bonds Variable Rate Debt and Series 2005D Bonds Variable Rate Debt, the "Prepetition Variable Rate Debt" and, together with the Prepetition Fixed Rate Debt, the "Prepetition Debt");

(b)    the Reimbursement Agreement Variable Rate Debt is not subject to subordination or recharacterization for any reason; and

(c)    the Prepetition Secured Liens of the Master Trustee for the benefit of holders of the Reimbursement Agreement Variable Rate Debt are valid, duly authorized, perfected, enforceable, non-voidable, first-priority (subject to the DIP Lender's Liens) liens and security interests in the Prepetition Collateral.

8.    The Cash Collateral.  The Master Trustee's security interests and liens have attached to all funds and property of the Debtor consisting of the Prepetition Collateral including the product, issues, rents, profits and other proceeds of the Prepetition Collateral and the Master Trustee's security interests and liens will, notwithstanding the commencement of the Chapter 11 Case, as of the Petition Date and thereafter, attach to product, issues, rents, profits and other proceeds of the Prepetition Collateral including, without limitation, the Segregated Funds (as defined herein).  Without limiting the foregoing, the Master Trustee's security interests and liens attach to all cash (whether as original collateral or cash proceeds of the Prepetition Collateral), negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents

20

now or hereafter in the possession, custody or control of the Debtor (as defined in Section 363(a) of the Bankruptcy Code, the "Cash Collateral"). For the avoidance of doubt, the term "Cash Collateral" does not include Trustee-Held Funds or funds held by the Debtor in any entrance fee escrow for the benefit of residents or otherwise. For the avoidance of doubt, the cash held by the Debtor as of the Petition Date (the "Segregated Funds") constitute Prepetition Collateral and "cash collateral" as such term is defined in Section 363(a) of the Bankruptcy Code but does not constitute "Cash Collateral" that is available for use under the terms and conditions hereof.

9.    Use of Cash Collateral. Subject to the terms and conditions set forth in this Final Order, the Debtor is, through and including the earlier of (a) the Maturity Date (as such term is defined (without waiver, amendment or modification of or to such definition as of the date hereof) in Section 1.1 of the DIP Credit Agreement), or (b) termination of this Final Order following issuance of a Termination Notice (as defined herein) as set forth in paragraph 17 below, authorized to use Cash Collateral solely in accordance with the Budget; provided, however, that any amendment or modification of the terms and conditions hereof, or any amendment, modification, roll-forward or replacement of the Budget itself, shall be subject to the prior written consent of the Master Trustee and the Applicable Prepetition Lenders. The Master Trustee and the Applicable Prepetition Lenders have acted in good faith in declining to object to the use of Cash Collateral on the terms of this Final Order and to the terms of the Final DIP Order.

10.    Adequate Protection. The Master Trustee is entitled, pursuant to sections 361 and 363(e) of the Bankruptcy Code, to adequate protection of its interests in the Prepetition Collateral, including, but not limited to, the Cash Collateral, for any diminution in value of its interests in the Prepetition Collateral, including, without limitation, any such diminution

21

resulting from the Debtor's use of Cash Collateral and any other Prepetition Collateral and the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code.

(a)   Liens.  As adequate protection for any diminution in value of the Master Trustee's interests in the Prepetition Collateral from and after the Petition Date, effective upon the date of this Final Order and without the necessity of the execution by the Debtor of any security agreements, pledge agreements, mortgages, financing statements or otherwise, and subject to the Carve Out (as defined herein) and, except as to the Segregated Funds, the DIP Lender's Liens (as defined herein), the following replacement security interests, mortgages and liens, with the same validity and to the same extent as the Prepetition Secured Liens, are hereby granted to the Master Trustee for the benefit of the Prepetition Lenders (collectively, the "Replacement Lien"), which Replacement Lien shall be (x) senior to the Prepetition Secured Liens and any properly perfected, unavoidable liens (and any claims secured thereby) that, as of the Petition Date, are senior and prior to the Prepetition Secured Liens, and (y) junior to the liens granted to the DIP Lender (the "DIP Lender's Liens") with respect to the DIP Financing as provided herein below:

(1)   a perfected second-priority senior security interest in and lien upon the Prepetition Collateral; and

(2)   a perfected second-priority senior security interest in and lien upon all existing and after-acquired tangible and intangible personal property and assets of the Debtor (excluding avoidance actions) acquired on or after the Petition Date (collectively, the "Postpetition Collateral").

22

(b)    <u>Postpetition Effect of Security Interest</u>.  Notwithstanding anything to the contrary set forth herein or in section 552 of the Bankruptcy Code, the Prepetition Secured Liens and the Replacement Lien shall also be deemed to be perfected second-priority senior security interests in and liens upon and in the Cash Collateral collected and/or received by the Debtor after the Petition Date (the "<u>Postpetition Cash Collateral</u>").

(c)    <u>Section 507(b) Claim</u>.  The Master Trustee and the Prepetition Lenders are hereby granted (subject to the Carve Out and the senior claim granted to the DIP Lender pursuant to the DIP Lender's Liens in the Prepetition Collateral and the Postpetition Collateral) a superpriority claim, with the same validity and to the same extent as the claims of the Master Trustee and Prepetition Lenders arising as a result of the Prepetition Secured Liens, in the Debtor's Chapter 11 Case as provided for in sections 503(b) and/or 507(b) of the Bankruptcy Code with priority over any and all other administrative expenses in the Debtor's Chapter 11 Case of any kind payable or allowed pursuant to any provision of the Bankruptcy Code, including, but not limited to, sections 105, 326, 328, 330, 365, 503(a) 503(b), 507(a), 507(b), 546, 551, 552, 726(d), 1113 and/or 1114 of the Bankruptcy Code.

(d)    <u>Interest, Fees and Expenses</u>.  Subject to the reservation of the right of any interested party to later assert that such payments should be re-allocated to principal in accordance with section 506 of the Bankruptcy Code, the Master Trustee and the Prepetition Lenders shall receive, as additional adequate protection, reimbursement from the Debtor and its estate of all fees, costs and expenses incurred after the Petition Date payable to the Master Trustee, the Fixed Rate Bond Trustee, the Variable Rate Bond Trustee and the Applicable Prepetition Lenders under the Prepetition Credit Documents, including but not limited to, the reasonable fees and expenses of counsel and other professional advisors for the Master Trustee,

23

the Fixed Rate Bond Trustee, the Variable Rate Bond Trustee and the Applicable Prepetition Lenders (the "Professional Expenses"), including, but not limited to, cash payments expressly provided for under the Budget.    The $50,000 budgeted weekly for the Debtor to pay the Professional Expenses of the Master Trustee, holders of Fixed Rate Claims and holders of Variable Rate claims shall be allocated, and which applicable allocated amount shall be paid weekly by the Debtor to the Master Trustee, holders of Fixed Rate Claims and holders of Variable Rate claims, as follows: $15,000 to the Master Trustee, $14,000 to the holders of Fixed Rate Claims and $21,000 to the holders of Variable Rate Claims (the "Professional Expenses Split").  The Professional Expenses Split shall apply retroactively to the date of entry of the Interim Order and any and all payments of Professional Expenses made or to be made in accordance with the Budget shall be made in accordance with the Professional Expenses Split. As of the date hereof, the Debtor has not made any payments of Professional Expenses. Notwithstanding the foregoing, payment of the Professional Expenses and cash payments expressly provided for in the Budget shall be in addition to payments due by the Debtor to the Master Trustee, the Fixed Rate Bond Trustee and the Variable Rate Bond Trustee on account of the fees and expenses (including professional fees other than the Professional Expenses) related to carrying out each such party's respective duties under Prepetition Credit Documents in the ordinary course, as provided pursuant to the Prepetition Credit Documents. Notwithstanding the foregoing, the Master Trustee and the Applicable Prepetition Lenders further reserve their rights to assert claims for the payment of additional amounts provided for in the Prepetition Credit Documents. Notwithstanding anything to the contrary in this Section 10(d), the DIP Lender shall not be obligated to fund any amounts not expressly included in the Budget.

24

CHI:2599082.16

(e) <u>Trustee-Held Funds</u>.   The Debtor stipulates and agrees that the Trustee-Held Funds are not collateral to secure the repayment of the Debtor's obligations with respect to the DIP Financing, are not encumbered by the liens granted to the DIP Lender and are not property of the Debtor's estate, and that the Master Trustee, the Fixed Rate Bond Trustee, the Variable Rate Bond Trustee and the Prepetition Lenders may, as applicable, without further Court authority (including, without limitation, the need to file a motion to lift the automatic stay), access and apply the Trustee-Held Funds in accordance with the terms of the Prepetition Credit Documents.   The relevant trustee shall provide the Debtor with notice of the amount and use of any payments made from the Trustee-Held Funds.

(f) <u>Additional Adequate Protection</u>.   As additional adequate protection for the Master Trustee and the Applicable Prepetition Lenders:   (I) the Debtor shall continue to prepare and deliver to the Master Trustee and the Applicable Prepetition Lenders all documents and reports required to be prepared and delivered to the Master Trustee under the Prepetition Credit Documents, in each case at the times and in the manner and form set forth therein (with a copy of such information to be provided to counsel for the Committee); <u>provided</u>, <u>however</u>, all monthly reports required to be delivered pursuant to the Prepetition Credit Documents will be required to be delivered within thirty (30) days after the end of each month; (II) the Debtor shall deliver to the Master Trustee and the Applicable Prepetition Lenders a report with respect to the Debtor's compliance with the Budget on the same basis as provided to the DIP Lender; (III) the Master Trustee and the Applicable Prepetition Lenders shall have the right that is otherwise granted to the DIP Lender in Section 8.2(o) of the DIP Credit Agreement to approve the form and substance of any motion for approval of bidding procedures, any order approving bid procedures and any order approving a sale (subject to the same reasonableness standard set forth therein); (IV) the

CHI:2599082.16

Debtor agrees that it will segregate into a separate account, to be established with BAC, the Segregated Funds, which Segregated Funds will not be available for use by the Debtor in accordance with this Final Order, the Budget or otherwise, subject to further agreement by the Master Trustee, the Applicable Prepetition Lenders and the Debtor and subject to further order of this Court; (V) subject to the terms and conditions of the Prepetition Credit Documents, the Master Trustee and the Applicable Prepetition Lenders shall retain and are hereby authorized to exercise all appraisal and inspection rights with respect to the Prepetition Collateral and the Cash Collateral; and (VI) the Debtor shall maintain with respect to the Prepetition Collateral insurance of the type and in the amount (xx) as the Debtor maintained as of the Petition Date, and (yy) as required under the Prepetition Credit Documents.

11.    <u>Perfection of Adequate Protection Liens</u>.  Neither the Master Trustee nor any Prepetition Lender shall be required to file or record financing statements, mortgages, notices of lien, or similar instruments in any jurisdiction or take any other action in order to validate and perfect the security interests and liens granted to them pursuant to this Final Order.  If the Master Trustee shall, in its sole discretion, choose to file such financing statements, mortgages, notices of lien or similar instruments or otherwise confirm perfection of such security interests and liens, the liens and security interests granted herein shall be deemed perfected at the time and on the date of entry of this Final Order.  Upon request by the Master Trustee, the Debtor shall, without the further consent of any party, to take any actions and to execute and deliver such instruments (in each case without representation or warranty of any kind) as may be necessary to enable the Master Trustee to further perfect, preserve and enforce the security interests, mortgages and liens granted to the Master Trustee by this Final Order.

CHI:2599082.16

12.    <u>Limitation on Charging Expenses Against Collateral</u>. From and after entry of this Final Order with respect to the use of Cash Collateral, no expenses of administration of this Chapter 11 Case or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from the Prepetition Collateral or the Cash Collateral, pursuant to section 506(c) of the Bankruptcy Code or any similar principal of law, without the Master Trustee's and Applicable Prepetition Lenders' prior written consent, and no such consent will be implied from any action, inaction, or acquiescence by the Master Trustee or the Prepetition Lenders.

13.    <u>Limitations on Use of Cash Collateral</u>. Notwithstanding anything herein to the contrary, no Cash Collateral may be used to (i) object, contest or raise any defense to, the validity, authorization, perfection, priority, extent, or enforceability of the Prepetition Debt, the Prepetition Secured Liens, or the Replacement Lien granted by this Final Order, (ii) assert any claims or causes of action against the Master Trustee or the Prepetition Lenders, or (iii) as long as the Debtor is authorized or able to continue to use Cash Collateral pursuant to the terms of this Final Order, attempt to obtain, without the consent of the Master Trustee and the Prepetition Lenders, or over the objection of the Master Trustee or the Prepetition Lenders, the Court's authorization to use Cash Collateral under terms other than those provided herein or the Court's authorization to grant any priming, senior (other than with respect to the DIP Financing as set forth herein) security interest in or lien on the Prepetition Collateral or the Cash Collateral.

14.    <u>Automatic Stay</u>. The automatic stay extant under section 362(a) of the Bankruptcy Code shall be, and it hereby is, modified to the extent necessary to permit (i) the Master Trustee and the Applicable Prepetition Lenders to apply payments made pursuant to this Final Order in accordance with the terms and provisions of this Final Order and the Budget and

27

(ii) the Master Trustee and the Applicable Prepetition Lenders to send the Termination Notice (as defined herein) and exercise any rights and remedies set forth herein.

15.   Reservation of Rights of Prepetition Lenders.   The Master Trustee and the Prepetition Lenders reserve the right to request further or different adequate protection in the future, and the Debtor or any other party may contest any such request.  In addition, the Master Trustee and the Prepetition Lenders reserve all rights and defenses, including, without limitation, with respect to any final order or final relief pertaining to the Segregated Funds and/or the Prepetition Collateral.

16.   Events of Default.   Each of the following shall constitute an "Event of Default" hereunder:  (i) use of Cash Collateral other than as set forth herein and in compliance with the Budget; (ii) use of the Segregated Funds; (iii) the Debtor or any other party applies to the Court for an order authorizing the use of Cash Collateral or that seeks approval of a priming, senior (other than with respect to the DIP Financing as set forth herein) security interest in or lien upon Cash Collateral or the Prepetition Collateral; (iv) the filing by the Debtor or any other party of any pleading objecting to or seeking to challenge the Master Trustee's and/or the Prepetition Lenders' claims with respect to the Prepetition Debt or the Master Trustee's lien upon the Segregated Funds, Cash Collateral or the Prepetition Collateral or otherwise asserting rights, claims or causes of action against the Master Trustee and/or the Prepetition Lenders with respect to the Prepetition Debt; (v) the breach by the Debtor of its obligations under this Final Order; (vi) any stay, reversal, vacatur or rescission of this Final Order; (vii) the dismissal of, conversion of or appointment of an examiner with expanded powers in this Chapter 11 Case; (viii) the sale of a controlling interest in the Debtor; (ix) the issuance of a Termination Notice (as defined herein); (x) failure of the Debtor to continue to engage a consultant acceptable to Master Trustee

28

and/or the Applicable Prepetition Lenders to provide financial and operational advice; (xi) the filing by the Debtor of any Final DIP Documents or any final documents pertaining to the DIP Financing not acceptable to and not supported by the Master Trustee and the Prepetition Lenders; (xii) the filing by the Debtor of any bid procedure and/or sale documents relating to the sale of the Prepetition Collateral, Postpetition Collateral and/or Cash Collateral not acceptable to and not supported by the Master Trustee and the Applicable Prepetition Lenders or (xiii) the occurrence of any Default or Event of Default (each as defined in the Final DIP Documents) under the Final DIP Documents.

17.     Termination Notice.   Immediately upon the occurrence or existence of an Event of Default, the Master Trustee shall be authorized to issue a notice (a "Termination Notice") (which Termination Notice may be delivered by electronic mail) thereof to the Debtor, its counsel, counsel to the Committee, counsel to the DIP Lender and the U.S. Trustee.  Unless, within two (2) days after the issuance of such notice, the Court determines that the applicable Event of Default has not occurred or does not exist, the Debtor's authority to use Cash Collateral shall terminate.

18.     Carve Out.   The Replacement Liens and superpriority claims granted hereunder shall be junior and subordinate to:[2]  (a) all unpaid fees and expenses (the "Debtor Professional Fees and Expenses", which Debtor Professional Fees and Expenses exclude, for the avoidance of doubt, any and all paid professional fees and expenses) of the attorneys,

---

[2]  Sections 10 and 23 hereof set forth the priority of the Replacement Liens and superpriority claims granted hereunder vis-à-vis the DIP Lender's Liens and the DIP Lender's claims.

CHI:2599082.16

accountants or other professionals retained by the Debtor (the "Debtor Professionals"), to the extent set forth in the schedule of anticipated professional fee liabilities attached hereto as Exhibit B as adjusted for amounts actually paid (the "Debtor Professional Fee Schedule") (which extent shall be measured by and limited by, in terms of both timing and amount but subject to reasonable variances (other than an upward variance with respect to the maximum overall amount of such liabilities on a professional-by-professional basis), such Debtor Professional Fee Schedule) and, in any event, incurred prior to the delivery of a Termination Notice; (b) all unpaid fees and expenses (the "Committee Professional Fees and Expenses" and, collectively with the Debtor Professional Fees and Expenses, the "Professional Fees and Expenses," which Committee Professional Fees and Expenses exclude, for the avoidance of doubt, any and all paid professional fees and expenses) of the attorneys, accountants or other professionals retained by the Committee (the "Committee Professionals" and, collectively with the Debtor Professionals, the "Professionals"), to the extent set forth in the schedule of anticipated professional fee liabilities attached hereto as Exhibit C as adjusted for amounts actually paid (the "Committee Professional Fee Schedule" and, collectively with the Debtor Professional Fee Schedule, the "Professional Fee Schedule") (which extent shall be measured by and limited by, in terms of both timing and amount but subject to reasonable variances (other than an upward variance with respect to the maximum overall amount of such liabilities), such Committee Professional Fee Schedule) and, in any event, incurred prior to the delivery of a Termination Notice;[3]

---

[3] Notwithstanding anything herein to the contrary, the parties in interest to this bankruptcy case reserve all rights with respect to the amount of $215,000 set forth in the Committee Professional Fee Schedule during the second full 13-week period of this case (i.e., the 13-week period after

(Cont'd on following page)

CHI:2599082.16

(c) Professional Fees and Expenses in the amount of $250,000 incurred after delivery of a

Termination Notice; and (d) the payment of fees pursuant to 28 U.S.C. § 1930 to the extent

related to the Chapter 11 Case of the Debtor, provided that all such fees and expenses shall be

subject to approval by a final order of the Court pursuant to sections 326, 328, 330, 331 or 363 of

the Bankruptcy Code (the "Carve Out").  The portion of the Carve Out set forth in clause (c) of

the preceding sentence herein is the same as the $250,000 post-default carve out set forth in the

DIP Credit Agreement, and no Carve Out amounts set forth in clause (c) of the preceding

sentence shall be in addition to the $250,000 post-default carve out set forth in the DIP Credit

Agreement.  Nothing in this Paragraph 18 shall limit, or shall be deemed to limit, the Debtor's

authority to use Cash Collateral to pay, free and clear of the Replacement Liens and superpriority

claims granted hereunder, the fees and expenses of Professionals as and to the extent set forth in

the Budget; provided, however, that all such fees and expenses shall be subject to approval by a

final order of the Court pursuant to sections 326, 328, 330, 331 or 363 of the Bankruptcy Code.

19.    Parties in Interest Bound.

(a)    The admissions contained in paragraphs 6 and 7 of this Final Order shall be

binding on the Debtor under all circumstances and shall be binding upon all other parties in

interest, including, without limitation, the Committee and any chapter 7 or chapter 11 trustee that

---

(Cont'd from preceding page)

February 12, 2012 and from February 13, 2012 through and including May 11, 2012) (the
"Second Scheduled Committee Amount") including, without limitation, the rights of the Debtor,
Master Trustee, Fixed Rate Bond Trustee, Variable Rate Bond Trustee, Prepetition Lenders, DIP
Lender, Committee and each of their respective professionals to assert that the Second Scheduled
Committee Amount is too large, too small or otherwise an inappropriate amount with respect to
the Committee Professionals with respect to the second full 13-week period of this case.

may be appointed or elected on behalf of the estate of the Debtor, except to the extent that (i) a

party in interest has filed an adversary proceeding or contested matter challenging the validity,

enforceability or priority of the Prepetition Debt or the liens on the Prepetition Collateral in

respect thereof, or otherwise asserting any claims or causes of action against the Master Trustee

or the Prepetition Lenders on behalf of the Debtor's estate, no later than February 28, 2012 (the

"Investigation Period"); provided, however, that Committee may petition the Court for entry of

an order extending the Investigation Period upon a showing by the Committee of cause to extend

the Investigation Period; and (ii) the Court rules in favor of the plaintiff in any such timely filed

adversary proceeding or contested matter. If any such adversary proceeding or contested matter

is timely commenced as of such date, the admissions contained in this Final Order shall

nonetheless remain binding and preclusive (as provided in this paragraph) except to the extent

that such acknowledgments and agreements are expressly challenged in such adversary

proceeding or contested matter.

      (b)    If no such adversary proceeding or contested matter is commenced as of

such date, then (i) the Prepetition Debt shall constitute allowed secured claims, not subject to

subordination, other than as set forth herein and in the Final DIP Order, and otherwise

unavoidable, for all purposes in this Chapter 11 Case and any subsequent chapter 7 case, (ii) the

liens securing the Prepetition Debt on the Prepetition Collateral shall be deemed legal, valid,

binding, duly authorized, perfected, not subject to defense, counterclaim, recharacterization,

offset of any kind, subordination, other than as set forth herein and in the Final DIP Order, and

otherwise unavoidable, (iii) the Master Trustee, the Prepetition Lenders, the Prepetition Debt and

the liens on the Prepetition Collateral securing the Prepetition Debt shall not be subject to any

other or further challenge by any party in interest seeking to exercise the rights of the Debtor's

CHI:2599082.16

estate, including, without limitation, any successor thereto, and (iv) the Master Trustee and the Prepetition Lenders shall be deemed released from any and all rights, claims, causes of action and liabilities arising from or in connection with the Prepetition Debt, the Prepetition Collateral, the Prepetition Credit Documents and/or the extension of credit or other financial accommodations thereunder or with respect thereto.

(c)   <u>Successors and Assigns</u>.   The provisions of this Final Order shall be binding upon the Master Trustee, the Prepetition Lenders, the Debtor, and their respective successors and assigns (including any trustee hereinafter appointed or elected for the Debtor's estate) and inure to the benefit of the Master Trustee, the Prepetition Lenders and the Debtor and (except with respect to any trustees hereinafter appointed or elected for the estate of the Debtor) its respective successors and assigns.

20.   <u>Priority of Certain Liens</u>.   Except as provided in paragraph 10(a) hereof, the Replacement Liens granted to the Master Trustee and the Prepetition Lenders by this Final Order shall not be deemed to prime any preexisting, valid, and perfected liens or security interests in or against any assets of the Debtor, subject to further order of this Court.

21.   <u>Attachment of Liens</u>.   This Court shall not, based on the "equities of the case" or otherwise, rule or otherwise order that the Prepetition Secured Liens or the Replacement Liens do not attach to the proceeds of collateral to which such liens would attach under applicable law and this Final Order.

22.   <u>Variable Rate True-Up</u>.   The Debtor and the Applicable Fixed Rate Holders acknowledge and agree that, as of the Petition Date, there was a "Debt Service Payment Ratio" imbalance with respect to the "Variable Rate Note Payments" and "Series 2010 Note Payments"

33

(as defined in the Master Indenture) made by the Debtor subsequent to March 30, 2011 (the

"Intercreditor Imbalance"). The Debtor and the Applicable Fixed Rate Holders acknowledge

and agree that, pursuant to the Master Trust Indenture, the holders of the Variable Rate Bonds

are entitled to a "true-up" cash payment in the amount of the Intercreditor Imbalance, and such

amount shall be paid to the holders of the Variable Rate Bonds on a first-out basis (subject to the

DIP Lender's Liens and the Replacement Lien set forth in Section 10(a)(1) hereof) from the

proceeds of any sale or disposition of all or substantially all of the Debtor's assets

23.    Rights of DIP Lender. Nothing in this Final Order shall, or shall be deemed

to, derogate any right, protection or privilege granted to the DIP Lender under the terms of the

Final DIP Order or the DIP Credit Agreement or the other documents evidencing or securing the

DIP Financing.

Dated:      Chicago, Illinois
            December ___, 2011

_____
UNITED STATES BANKRUPTCY JUDGE

34

EXHIBIT A

The Clare at Water Tower
Exhibit A: DRAFT DIP Cash Flow Projection
Updated: December 20, 2011
DRAFT; Subject to Revision

| Week Beginning: | 11/14 Actual Post-Petition | 11/21 Actual Post-Petition | 11/28 Actual Post-Petition | 12/5 Actual Post-Petition | 12/12 Projected Post-Petition | 12/19 Projected Post-Petition | 12/26 Projected Post-Petition | 1/2 Projected Post-Petition | 1/9 Projected Post-Petition | 1/16 Projected Post-Petition | 1/23 Projected Post-Petition | 1/30 Projected Post-Petition | 2/6 Projected Post-Petition | 13-Week Total Post-Petition |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Operating Cash Receipts** | | | | | | | | | | | | | | |
| Private Pay Fees | 83,455 | - | 119,265 | 202,921 | 350,000 | 85,000 | 30,000 | 100,000 | 350,000 | 85,000 | 30,000 | 10,000 | 90,000 | 1,535,642 |
| Medicare Reimbursement | - | 273,486 | 63,167 | - | - | - | 308,850 | - | - | 8,700 | 295,800 | 4,350 | - | 954,353 |
| Total Cash Receipts | 83,455 | 273,486 | 182,432 | 202,921 | 350,000 | 85,000 | 338,850 | 100,000 | 350,000 | 93,700 | 325,800 | 14,350 | 90,000 | 2,489,995 |
| **Operating Cash Disbursements** | | | | | | | | | | | | | | |
| Salaries and Benefits | - | 187,404 | 182,153 | 187,919 | 56,800 | 188,000 | - | 188,000 | 227,500 | 244,800 | - | 188,000 | - | 1,241,202 |
| Management Fees | - | - | - | 30,000 | - | - | - | - | 30,000 | - | - | - | 30,000 | 90,000 |
| Lease | - | - | - | - | - | 198,760 | - | 198,760 | - | - | - | - | - | 397,520 |
| Ordinary Course Professionals | - | - | - | - | 105,000 | - | - | 32,000 | - | 10,000 | 10,000 | 32,000 | - | 74,000 |
| Clinical Pharmaceutical Services | - | - | - | - | - | 106,500 | - | - | - | 106,500 | - | - | - | 318,000 |
| Insurance | - | 106,751 | - | - | - | - | - | - | - | - | - | - | - | 106,751 |
| Advertising & Marketing | - | - | - | 18,206 | - | - | 36,809 | - | - | - | - | 60,809 | - | 115,825 |
| Food Service | - | - | - | - | 160,000 | 165,000 | - | - | - | 160,000 | - | - | - | 485,000 |
| Other Vendors | - | - | - | 23,152 | 54,000 | 54,000 | 54,000 | 54,000 | 54,000 | 54,000 | 54,000 | 54,000 | 54,000 | 509,152 |
| Utilities | - | - | - | 1,692 | 127,200 | 97,500 | 93,300 | 127,200 | - | - | - | - | 127,200 | 574,092 |
| Total Operating Cash Disbursements | - | 294,155 | 182,153 | 260,969 | 503,000 | 611,000 | 184,109 | 472,760 | 211,200 | 565,300 | 64,000 | 533,569 | 211,200 | 3,911,xxx |
| Subtotal: Net Cash from Operations Before Restructuring | 83,455 | (20,669) | 280 | (58,048) | (153,000) | (526,000) | 154,741 | (372,760) | 138,800 | (471,600) | 261,800 | (519,219) | (121,200) | (1,421,xxx) |
| **Restructuring / Non-Recurring Disbursements** | | | | | | | | | | | | | | |
| DLA Piper | - | - | - | - | - | - | - | 227,500 | - | - | - | - | 130,000 | 357,977 |
| Deloitte FAS | - | - | - | - | - | - | - | 94,250 | - | - | - | - | 78,000 | 172,571 |
| Edelman - Public Relations | - | - | - | - | - | - | - | 8,125 | - | - | - | - | 3,250 | 11,375 |
| Epiq / Other | - | - | - | - | - | 75,000 | - | 39,000 | - | - | - | - | 39,000 | 153,000 |
| Houlihan Lokey - Investment Bank | - | - | - | - | - | - | - | 53,750 | - | - | 250,000 | - | 53,750 | 357,xxx |
| Bondholder Prof. Fee Escrow | - | - | - | - | 300,000 | - | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 650,000 |
| UCC / Resident Committee Prof. Fees | - | - | - | - | - | - | - | 32,500 | - | - | - | - | 79,625 | 115,000 |
| DIP Lender Prof. Fees | 577,000 | - | - | 75,000 | - | - | 75,000 | 75,000 | 75,000 | - | 75,000 | - | 75,000 | 225,000 |
| Preliminary DIP Lender Fees / Expenses | - | - | - | 10,000 | - | - | 10,000 | - | 10,000 | - | - | - | 10,000 | 607,xxx |
| Resident Refunds | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| DIP Interest / Unused Fee | - | - | - | 3,924 | - | - | 12,292 | 12,292 | 12,500 | - | - | 12,500 | - | 26,xxx |
| U.S. Trustee Fees | - | - | - | - | - | - | - | - | - | - | - | 13,000 | - | - |
| Total Financing Disbursements | 577,000 | - | - | 88,924 | 591,924 | - | 125,000 | 62,292 | 590,125 | 50,000 | 300,000 | 75,500 | 518,625 | 2,687,465 |
| Total Cash Disbursements | 577,000 | 294,155 | 182,153 | 591,924 | 911,000 | - | 535,052 | 801,325 | 615,300 | 364,000 | 709,069 | 729,625 | 6,599,008 |
| **Net Cash Flow** | (493,545) | (20,669) | 280 | (828,000) | 29,741 | (435,052) | (451,325) | (521,600) | (38,200) | (594,719) | (639,825) | (4,109,013) | | |
| Beginning Cash Balance | 135,203 | 2,141,658 | 2,577,601 | 2,759,754 | 2,963,394 | 2,721,470 | 1,819,470 | 1,714,008 | 1,278,956 | 827,631 | 271,631 | 732,831 | 638,112 | 135,203 |
| Net Cash Flow | (493,545) | (20,669) | 280 | (241,924) | (241,924) | (828,000) | 29,741 | (435,052) | (451,325) | (521,600) | (38,200) | (594,719) | (639,825) | (4,109,013) |
| Other One-time, Non-operating Receipts / Payments | - | (20,650) | 261,688 | - | - | - | - | - | - | - | - | - | - | 607,300 |
| Trustee Cash Collateral Pursuant to DIP Order | - | 456,612 | - | - | - | - | - | (76,000) | - | (35,000) | (36,200) | (594,719) | - | (135,203) |
| DIP Draw (min $250k cash balance, min $500k draw) | 2,500,000 | - | - | 2,500,000 | - | - | - | 2,500,000 | 2,500,000 | 2,500,000 | 2,500,000 | 2,500,000 | 500,000 | 4,000,000 |
| Ending Cash Balance | 2,141,658 | 2,577,601 | 2,759,754 | 2,963,394 | 2,721,470 | 1,819,470 | 1,714,008 | 1,278,956 | 827,631 | 271,631 | 732,831 | 638,112 | 498,287 | 498,287 |
| Trustee Cash Collateral | 135,203 | 135,203 | 135,203 | 135,203 | 135,203 | 135,203 | 135,203 | 135,203 | 135,203 | 135,203 | 135,203 | 135,203 | 135,203 | 135,203 |
| **DIP Balance, Beg** | - | 2,500,000 | 2,500,000 | 2,500,000 | 2,500,000 | 2,500,000 | 2,500,000 | 2,500,000 | 2,500,000 | 2,500,000 | 2,500,000 | 2,500,000 | 3,500,000 | - |
| DIP Draw (min $250k cash balance, min $500k draw) | 2,500,000 | - | - | - | - | - | - | - | - | - | - | - | 500,000 | 4,000,000 |
| DIP Balance, End | 2,500,000 | 2,500,000 | 2,500,000 | 2,500,000 | 2,500,000 | 2,500,000 | 2,500,000 | 2,500,000 | 2,500,000 | 2,500,000 | 2,500,000 | 3,000,000 | 3,500,000 | 4,000,000 |
| | | | | | | | | | | | | | | |
| Professional Fees Projected to be Incurred, but not Paid | 137,506 | 365,000 | 512,500 | 697,500 | 1,092,500 | 1,312,500 | 1,430,000 | 1,535,000 | 1,171,125 | 1,344,375 | 1,186,125 | 1,279,875 | 990,000 | 990,000 |

Confidential
Draft - Subject to Revision

EXHIBIT B

The Clare at Water Tower
Exhibit B: DRAFT DIP Cash Flow Projection
Updated: December 20, 2011
DRAFT; Subject to Revision

Confidential
Draft - Subject to Revision

| Week Beginning: | 11/15 Projected Post-Petition | 11/21 Projected Post-Petition | 11/28 Projected Post-Petition | 12/5 Projected Post-Petition | 12/12 Projected Post-Petition | 12/19 Projected Post-Petition | 12/26 Projected Post-Petition | 1/2 Projected Post-Petition | 1/9 Projected Post-Petition | 1/16 Projected Post-Petition | 1/23 Projected Post-Petition | 1/30 Projected Post-Petition | 2/6 Projected Post-Petition | 2/13 Projected Post-Petition | 2/20 Projected Post-Petition |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Restructuring / Non-Recurring Disbursements** | | | | | | | | | | | | | | | |
| **DLA Piper** | | | | | | | | | | | | | | | |
| Accrued, Begin | | 450,000 | 450,000 | 350,000 | 350,000 | 350,000 | 350,000 | 350,000 | 350,000 | 350,000 | 350,000 | 350,000 | 350,000 | 350,000 | 350,625 |
| Incurred | 87,500 | 87,500 | 87,500 | 262,500 | 350,000 | 400,000 | 450,000 | 550,000 | 550,000 | 372,500 | 422,500 | 472,500 | 522,500 | 442,500 | 466,550 |
| Paid 65.0% | | | | | | | | | (227,500) | | | | (150,000) | | |
| Holdback Payment | | | | | | | | | | | | | | | |
| Accrued, End | 87,500 | 175,000 | 262,500 | 350,000 | 400,000 | 450,000 | 500,000 | 550,000 | 372,500 | 422,500 | 472,500 | 522,500 | 442,500 | 492,500 | 542,500 |
| **Deloitte FAS** | | | | | | | | | | | | | | | |
| Accrued, Begin | | 30,000 | 70,000 | 115,000 | 145,000 | 175,000 | 205,000 | 235,000 | 265,000 | 200,750 | 230,750 | 260,750 | 290,750 | 242,750 | 272,750 |
| Incurred | 30,000 | 40,000 | 45,000 | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 |
| Paid 65.0% | | | | | | | | | (94,250) | | | | (78,000) | | |
| Holdback Payment | | | | | | | | | | | | | | | |
| Accrued, End | 30,000 | 70,000 | 115,000 | 145,000 | 175,000 | 205,000 | 235,000 | 265,000 | 200,750 | 230,750 | 260,750 | 290,750 | 242,750 | 272,750 | 302,750 |
| **Edelman** | | | | | | | | | | | | | | | |
| Accrued, Begin | | 5,000 | 10,000 | 10,000 | 12,500 | 12,500 | 15,000 | 15,000 | 17,500 | 9,375 | 11,875 | 11,875 | 11,875 | 8,625 | 8,625 |
| Incurred | 5,000 | 5,000 | 10,000 | 2,500 | 2,500 | 2,500 | | 2,500 | (8,125) | 2,500 | | | (3,250) | | |
| Paid 65.0% | | | | | | | | | | | | | | | |
| Holdback Payment | | | | | | | | | | | | | | | |
| Accrued, End | 5,000 | 10,000 | 10,000 | 12,500 | 12,500 | 15,000 | 15,000 | 17,500 | 9,375 | 11,875 | 11,875 | 11,875 | 8,625 | 8,625 | 8,625 |
| **Epiq / Other** | | | | | | | | | | | | | | | |
| Accrued, Begin | | 15,000 | 65,000 | 60,000 | 65,000 | 65,000 | 60,000 | 105,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 |
| Incurred | 15,000 | 15,000 | 30,000 | 45,000 | 60,000 | 75,000 | 90,000 | 105,000 | 120,000 | 84,750 | 88,500 | 62,250 | 96,000 | 60,750 | 64,500 |
| Paid 63.0% | | | | | | | (75,000) | | (30,000) | 3,750 | 3,750 | 3,750 | (30,000) | 3,750 | 3,750 |
| Holdback Payment | | | | | | | | | | | | | | | |
| Accrued, End | 15,000 | 30,000 | 45,000 | 60,000 | 75,000 | 90,000 | 105,000 | 120,000 | 84,750 | 88,500 | 92,250 | 96,000 | 60,750 | 64,500 | 68,250 |
| **Houlihan Lokey** | | | | | | | | | | | | | | | |
| Accrued, Begin | | | 80,000 | 80,000 | 80,000 | 330,000 | 410,000 | 410,000 | 410,000 | 356,250 | 436,250 | 186,250 | 186,250 | 132,500 | 132,500 |
| Financing Fee | | | | | | | | | | | | | | | |
| Incurred | | 80,000 | | | 250,000 | 80,000 | | | | 80,000 | | | | | 80,000 |
| Paid 63.0% | | | | | | | | | (53,750) | | (250,000) | | (53,750) | | |
| Holdback Payment | | | | | | | | | | | | | | | |
| Accrued, End | | 80,000 | 80,000 | 80,000 | 330,000 | 410,000 | 410,000 | 410,000 | 356,250 | 436,250 | 186,250 | 186,250 | 132,500 | 132,500 | 212,500 |
| **TOTAL** | | | | | | | | | | | | | | | |
| Total Paid | 137,500 | 365,000 | 512,500 | 647,500 | 992,500 | 1,170,000 | 1,265,000 | 1,362,500 | 1,023,625 | 1,169,875 | 1,023,625 | 1,107,375 | 887,125 | 970,875 | 1,194,625 |
| Total Holdback Payment | | | | | | | | | | | | | | | |
| Total Fees | 137,500 | 365,000 | 512,500 | 647,500 | 992,500 | 1,170,000 | 1,340,000 | 1,437,500 | 1,521,250 | 1,657,500 | 1,771,250 | 1,855,000 | 1,938,750 | 2,023,500 | 2,198,250 |
| **Cumulative Projected INCURRED Professional Fees for Carve-Out Purposes** | | | | | | | | | | | | | | | |
| Debtor Professionals | 137,500 | 365,000 | 512,500 | 647,500 | 992,500 | 1,170,000 | 1,340,000 | 1,437,500 | 1,521,250 | 1,657,500 | 1,771,250 | 1,855,000 | 1,938,750 | 2,023,500 | 2,198,250 |



The Class at Water Tower
Exhibit B: DRAFT DIP Cash Flow Projection
Updated: December 20, 2011
DRAFT: Subject to Revision

Confidential
Draft - Subject to Revision

| Week Beginning: | 12/27 Projected Post-Petition | 3/5 Projected Post-Petition | 3/12 Projected Post-Petition | 3/19 Projected Post-Petition | 3/26 Projected Post-Petition | 4/2 Projected Post-Petition | 4/9 Projected Post-Petition | 4/16 Projected Post-Petition | 4/23 Projected Post-Petition | 4/30 Projected Post-Petition | 5/7 Projected Post-Petition | 24-Week Total Post-Petition |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Restructuring / Non-Recurring Disbursement** | | | | | | | | | | | | |
| **DLA Piper** | | | | | | | | | | | | |
| Accrued, Begin | 255,000 | 255,000 | 386,000 | 350,000 | 520,000 | 450,000 | 350,000 | 350,000 | 350,000 | 350,000 | 350,000 | - |
| Incurred | 542,500 | 592,500 | 550,000 | 637,500 | 725,000 | 812,500 | 770,000 | 657,500 | 950,000 | 1,032,500 | 945,000 | 1,825,000 |
| Paid | 50,000 | (150,000) | 87,500 | 87,500 | 87,500 | 87,500 | 87,500 | 87,500 | 87,500 | (227,500) | 87,500 | (845,000) |
| Holdback Payment | | | | | | (130,000) | | | | | | |
| Accrued, End | 592,500 | 550,000 | 637,500 | 725,000 | 812,500 | 770,000 | 657,500 | 948,000 | 1,032,500 | 892,500 | 892,500 | 980,000 |
| **Deloitte FAS** | | | | | | | | | | | | |
| Accrued, Begin | 302,750 | 332,750 | 284,750 | 314,750 | 344,750 | 374,750 | 326,750 | 356,750 | 386,750 | 416,750 | 368,750 | - |
| Incurred | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 | 805,000 |
| Paid | | (78,000) | | | | (78,000) | | | | (78,000) | | (450,250) |
| Holdback Payment | | | | | | | | | | | | |
| Accrued, End | 332,750 | 284,750 | 314,750 | 344,750 | 374,750 | 326,750 | 356,750 | 386,750 | 416,750 | 368,750 | 398,750 | 398,750 |
| **Edelman** | | | | | | | | | | | | |
| Accrued, Begin | 8,625 | 8,625 | 7,000 | 7,000 | 7,000 | 7,000 | 7,000 | 7,000 | 7,000 | 7,000 | 7,000 | - |
| Incurred | | | | | | | | | | | | 20,000 |
| Paid | | (1,625) | | | | | | | | | | (13,000) |
| Holdback Payment | | | | | | | | | | | | |
| Accrued, End | 8,625 | 7,000 | 7,000 | 7,000 | 7,000 | 7,000 | 7,000 | 7,000 | 7,000 | 7,000 | 7,000 | 7,000 |
| **Epiq / Other** | | | | | | | | | | | | |
| Accrued, Begin | 14,000 | 14,000 | 15,000 | 15,000 | 15,000 | 15,000 | 60,000 | 60,000 | 60,000 | 60,000 | 67,500 | - |
| Incurred | 68,250 | 72,000 | 66,000 | 69,750 | 73,500 | 77,250 | 77,500 | 87,500 | 102,500 | 117,500 | 122,750 | 320,000 |
| Paid | 3,750 | (9,750) | 3,750 | 3,750 | 3,750 | 10,000 | 10,000 | 15,000 | 15,000 | 15,000 | 15,000 | (182,250) |
| Holdback Payment | | | | | | (8,750) | | | | (8,750) | | |
| Accrued, End | 72,000 | 66,000 | 69,750 | 73,500 | 77,250 | 77,500 | 87,500 | 102,500 | 117,500 | 122,750 | 137,750 | 137,750 |
| **Houlihan Lokey** | | | | | | | | | | | | |
| Accrued, Begin | 212,500 | 212,500 | 158,750 | 158,750 | 238,750 | 238,750 | 165,000 | 165,000 | 285,000 | 285,000 | 211,250 | - |
| Financing Fee | | | | 80,000 | | | | 80,000 | | | | 250,000 |
| Incurred | | | | | | | | | | | | 480,000 |
| Paid | | | | | | (83,750) | | | | (83,750) | | (518,750) |
| Holdback Payment | | | | | | | | | | | | |
| Accrued, End | 212,500 | 158,750 | 158,750 | 238,750 | 238,750 | 165,000 | 165,000 | 285,000 | 285,000 | 211,250 | 211,250 | 211,250 |
| **TOTAL** | | | | | | | | | | | | |
| Total Paid | 1,219,375 | 273,125 | 1,187,750 | 1,388,000 | 1,510,250 | 1,369,250 | 1,483,750 | 1,706,250 | 1,838,750 | 1,902,250 | 1,734,750 | 1,665,250 |
| Total Holdback Payment | | | | | | | | | | | | 1,734,750 |
| Accrued, End | 2,270,000 | 2,391,250 | 2,512,500 | 2,713,750 | 2,835,000 | 2,962,500 | 3,090,000 | 3,300,500 | 3,495,000 | 3,567,500 | 3,700,000 | 3,700,000 |
| Total Fees | | | | | | | | | | | | |

| | Max Carve-Out |
|---|---|
| **Cumulative Projected INCURRED Profession for Carve-Out Purposes** | |
| Debtor Professionals | 3,700,000 |

EXHIBIT C

Confidential
Draft - Subject to Revision

The Glen at Water Tower
Exhibit C: DRAFT DIP Cash Flow Projection
Updated: December 20, 2011
DRAFT; Subject to Revision

| Week Beginning: | 11/15 Projected Post-Petition | 11/21 Projected Post-Petition | 11/28 Projected Post-Petition | 12/5 Projected Post-Petition | 12/12 Projected Post-Petition | 12/19 Projected Post-Petition | 12/26 Projected Post-Petition | 1/2 Projected Post-Petition | 1/9 Projected Post-Petition | 1/16 Projected Post-Petition | 1/23 Projected Post-Petition | 1/30 Projected Post-Petition | 2/6 Projected Post-Petition | 2/13 Projected Post-Petition | 2/20 Projected Post-Petition |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Restructuring / Non-Recurring Disbursements** | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | |
| **UCC Prof. Fees** | | | | | | | | | | | | | | | |
| Accrual, Begin | - | - | - | 200,000 | 200,000 | 175,000 | 80,000 | 55,000 | 50,000 | 20,000 | 50,500 | 45,500 | 60,000 | 37,500 | 97,742 |
| Incurred | - | - | - | 50,000 | 50,000 | 150,000 | 142,500 | 165,000 | 172,500 | 147,500 | 155,000 | 152,500 | 172,500 | 102,875 | 127,161 |
| Paid | | | | 50,000 | 50,000 | 42,500 | 22,500 | 7,500 | 7,500 | 7,500 | 7,500 | 10,000 | 10,000 | 24,286 | 24,286 |
| Holdback Payment | | | | | | | | | (32,500) | | | | (79,625) | | |
| Accrual, End | - | - | - | 50,000 | 100,000 | 142,500 | 165,000 | 172,500 | 147,500 | 155,000 | 162,500 | 172,500 | 102,875 | 127,161 | 151,446 |

| **Cumulative Projected INCURRED Professional Fees for Carve-Out Purposes** | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| UCC Prof. Fees | - | - | - | 50,000 | 100,000 | 142,500 | 165,000 | 172,500 | 180,000 | 167,500 | 165,000 | 205,000 | 215,000 | 230,285 | 203,571 |

65.0%

The Glenn at Water Tower
Exhibit C: DRAFT DIP Cash Flow Projection
Updated: December 20, 2011
DRAFT; Subject to Revision

Confidential
Draft - Subject to Revision

| Week Beginning: | 2/27 Projected Post-Petition | 3/5 Projected Post-Petition | 3/12 Projected Post-Petition | 3/19 Projected Post-Petition | 3/26 Projected Post-Petition | 4/2 Projected Post-Petition | 4/9 Projected Post-Petition | 4/16 Projected Post-Petition | 4/23 Projected Post-Petition | 4/29 Projected Post-Petition | 5/7 Projected Post-Petition | 26-Week Total Post-Petition |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Restructuring / Non-Recurring Disbursement** | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| *UCC Prof. Fees* | | | | | | | | | | | | |
| Accrued, Begin | 97,142 | 97,142 | 97,142 | 97,142 | 97,142 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | - |
| Incurred | 151,446 | 175,732 | 178,892 | 127,028 | 152,213 | 176,499 | 130,142 | 137,642 | 145,142 | 152,642 | 97,500 | 430,000 |
| Paid | 24,285 | 24,285 | 24,285 | 24,285 | 24,285 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,521 | (250,249) |
| Holdback Payment | | (21,125) | (75,250) | | | (53,857) | | | | (63,142) | | (75,250) |
| Accrued, End | 175,732 | 178,892 | 127,028 | 152,213 | 176,499 | 130,142 | 137,642 | 145,142 | 152,642 | 97,500 | 104,501 | 104,501 |

| | 2/27 | 3/5 | 3/12 | 3/19 | 3/26 | 4/2 | 4/9 | 4/16 | 4/23 | 4/29 | 5/7 | Max Carve-Out |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Cumulative Projected INCURRED Profession for Carve-Out Purposes** | | | | | | | | | | | | |
| UCC Prof. Fees | 287,657 | 312,142 | 336,428 | 350,713 | 384,998 | 382,499 | 389,999 | 407,499 | 414,999 | 422,499 | 430,000 | 430,000 |