**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| The Clare at Water Tower, | § | Case No. 11-46151 |
| Debtor. | § | |
| | § | Hon. Timothy A. Barnes |
| | § | |
| | § | **Hearing Date**: **July 2, 2012 at 2:00 p.m. (CST)** |

**NOTICE OF FIRST AND FINAL FEE APPLICATION**

**PLEASE TAKE NOTICE THAT ON JUNE 22, 2012, SNR DENTON US LLP FILED ITS FIRST AND FINAL FEE APPLICATION FOR ALLOWANCE OF CHAPTER 11 ADMINISTRATIVE CLAIM FOR COMPENSATION AND REIMBURSEMENT OF EXPENSES FOR THE PERIOD OF DECEMBER 6, 2011 THROUGH MAY 31, 2012(THE "FINAL FEE APPLICATION").**

PLEASE TAKE FURTHER NOTICE THAT on July 2, 2012, at 2:00 p.m. (prevailing Central Time), a hearing on the Final Fee Application shall take place before the Honorable Timothy A. Barnes or before any other judge who may be sitting in his place or stead, in Courtroom 642 in the United States Courthouse, 219 South Dearborn Street, Chicago, Illinois, at which time you may appear if you deem fit.

Dated: June 22, 2012

                                      SNR DENTON US LLP

                                      /s/ Stefanie L. Wowchuk
                                    Stefanie L. Wowchuk (IL Bar No. 6294131)
                                    233 S. Wacker Drive
                                    Suite 7800
                                    Chicago, IL 60606
                                    stefanie.wowchuk@snrdenton.com
                                    Telephone: (312) 876-8000

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| The Clare at Water Tower, | § | Case No. 11-46151 |
| Debtor. | § | |
| | § | Hon. Timothy A. Barnes |
| | § | |
| | § | **Hearing Date**: **July 2, 2012 at 2:00 p.m. (CST)** |

**SUMMARY OF
FIRST AND FINAL APPLICATION OF SNR DENTON US LLP
FOR ALLOWANCE OF CHAPTER 11 ADMINISTRATIVE CLAIM FOR
COMPENSATION AND REIMBURSEMENT OF EXPENSES**

Name of Applicant:	SNR Denton US LLP

Authorized to Provide
Professional Services to:	The Official Committee of Unsecured Creditors

Date of Retention:	Effective as of December 6, 2011

Period for Which Compensation
And Reimbursement are Sought:	December 6, 2011 through May 31, 2012

Amount of Fees:	$593,087.00

Amount of Expense Reimbursement
Sought:	$9,422.53

Previous Applications:	No

Total Amount of Compensation and
Expenses Previously Allowed:	None

This is a(n):	___ Interim Application   _X_ Final Application

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| The Clare at Water Tower, | § | Case No. 11-46151 |
| Debtor. | § | |
| | § | Hon. Timothy A. Barnes |
| | § | |
| | § | **Hearing Date**: **July 2, 2012 at 2:00 p.m. (CST)** |

**FIRST AND FINAL FEE APPLICATION OF SNR DENTON US LLP
FOR ALLOWANCE OF CHAPTER 11 ADMINISTRATIVE CLAIM FOR
COMPENSATION AND REIMBURSEMENT OF EXPENSES**

SNR Denton US LLP ("**SNR Denton**"), counsel to the Official Committee of Unsecured Creditors in the above-captioned case (the "**Committee**"), hereby applies for allowance and payment in full (the "**Application**" or "**Final Fee Application**") of a Chapter 11 administrative claim for (i) compensation in the amount of $593,087.00 for the reasonable and necessary legal services that SNR Denton has rendered to the Committee (the "**Fees**") and (ii) reimbursement of the actual and necessary expenses that SNR Denton has incurred (the "**Expenses**") in the amount of $9,422.53 for the period from December 6, 2011 (the effective date of SNR Denton's retention) through May 31, 2012[1] (the "**Final Application Period"**).  In support of this Application, SNR Denton respectfully states as follows:

**INTRODUCTION**

SNR Denton was retained as counsel to the Committee shortly after the commencement of these proceedings.  The Committee was a "hybrid" committee consisting of five current and former residents and two trade creditors.  The overwhelming majority of the Committee's constituency, however, was the more than 120 current and former residents who held more than

---

[1] SNR Denton reserves the right to seek additional fees and expenses incurred after May 31, 2012, to the extent that there is additional litigation in this bankruptcy case.

$57 million of deposit claims against the Debtor. Although it was originally anticipated that these deposit claims would not be altered by the Debtor's bankruptcy (i.e., the residents would be "unimpaired"), the Debtor ultimately concluded that these deposit claims had to be restructured as a condition to any sale of the Clare as a continuing care retirement community.

For the residents, these deposit claims did not represent investments or other ordinary debts. These deposits were their life savings, their retirement. And the Clare was their home. Indeed, the failure of the Clare would not merely result in fewer dollars in a bank account or reflected on some account statement. The residents were confronted with the possibility of losing their retirement and life savings and their home. On top of that, the residents were almost totally unfamiliar with the bankruptcy process and felt a general mistrust of the Debtor's management due to certain prepetition restructuring efforts and a history of poor communications with the residents. *See* Declaration of Betty A. Bergstrom at ¶ 6, attached hereto as <u>Exhibit F</u>.

For all of these reasons, it was absolutely essential that the Committee, though SNR Denton as its counsel, be an active participant throughout these proceedings. As a result, SNR Denton was actively involved in the sale process (often over resistance from the Debtor and its advisors) and in all other aspects of the bankruptcy that impacted the Committee's constituencies (such as having to object to the overbroad and non-consensual third party releases set forth in the Debtor's plan of liquidation). SNR Denton, moreover, unfortunately also had to repeatedly fight attempts by the Debtor and its prepetition lenders to limit and deny the Committee appropriate representation in these proceedings. The fees and expenses related to all of these services are set forth in detail below and in the attached invoices, which SNR respectfully requests the Court approve on final basis pursuant to Bankruptcy Code § 330.

## BACKGROUND

1. On November 14, 2011 (the "**Petition Date**"), the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in this Court.

2. Since the Petition Date, the Debtor has continued in possession of its property and has continued to operate and manage its business as a debtor-in-possession pursuant to §§ 1107(a) and 1108 of the Bankruptcy Code.

3. On December 1, 2011, pursuant to § 1102 of the Bankruptcy Code, the United States Trustee for the Northern District of Illinois (the "**U.S. Trustee**") appointed the Committee. The Committee currently consists of seven members, including: (i) Betty Bergstrom, (ii) The Estate of Dolores Graff, (iii) Richard H. Harris, (iv) Beatrice Lehman, (v) Janet McDermott,[2] (vi) The City of Chicago and (vii) Sodexo America, LLC.

4. On December 6, 2011, the Committee selected SNR Denton to serve as its counsel, and on January 11, 2012, the Court authorized SNR Denton's retention [Dkt. No. 188].

5. On January 11, 2012, this Court entered an Order Under 11 U.S.C. §§ 105(a) and 331 Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals [Dkt. No. 187] (the "**Interim Compensation Order**").

6. This Application is submitted pursuant to the Interim Compensation Order, the Federal Rules of Bankruptcy Procedure and all applicable local rules.

## JURISDICTION

7. This Court has jurisdiction over these cases pursuant to 28 U.S.C. § 1334. This is a core proceeding under 28 U.S.C. § 157(b)(2)(A) and (O).

8. Venue of the Debtor's Chapter 11 case is proper in this district pursuant to 28 U.S.C. § 1408.

---

[2] Janet McDermott replaced her deceased husband, William McDermott, who was an original member of the Committee.

- 5 -

## RETENTION OF SNR DENTON US LLP

9.  SNR Denton was retained as counsel for the Committee effective December 6, 2011.  A copy of the retention order is attached as <u>Exhibit A</u> hereto.

## PROFESSIONAL SERVICES RENDERED

10. SNR's services throughout the Final Application Period enhanced the Committee's understanding of many issues critical in the Debtor's case and enabled the Committee to participate as an informed, efficient and productive unit in order to substantially ameliorate the treatment of many of the Debtor's unsecured creditors in this case.  SNR's significant efforts in this case ultimately helped accomplish a sale that allowed the Clare at Water Tower's residents to stay in their homes and protect their deposits and achieve a $75,000.00 carve-out for trade creditors.

## RELIEF REQUESTED

11. By this Application, SNR Denton seeks the entry of an order (i) allowing, on a final basis, $593,087.00 of fees as reasonable compensation for actual and necessary legal services rendered by SNR Denton to the Committee during the Final Application Period, (ii) allowing out-of-pocket expenses in the amount of $9,422.53 as reasonable and necessary charges and disbursements incurred by SNR Denton while providing services to the Committee during the Final Application Period and (iii) authorizing and directing the Debtor to remit to SNR Denton the sum of $602,509.53, less amounts already paid by the Debtor with respect to the Final Application Period.

12. As to amounts already paid to SNR Denton, the Court previously entered the Interim Compensation Order which permitted professionals to file monthly fee statements and receive payments, on an interim basis and without a fee hearing, for 85% of the fees and 100% of the expenses in such monthly statements after the expiration of a notice and objection period.

SNR Denton attempted to follow this procedure, but the Prepetition Lenders[3] objected to the very first monthly fee statement submitted by SNR for its December 2011 fees and expenses. Specifically, the Prepetition Lenders objected that the fees were too high and were projected, over the anticipated course of the case, to exceed the amount of the carve-out set forth in the Debtor's cash collateral order (the "**Lender Objection**"). Indeed, no specific time entries were identified as objectionable. The Prepetition Lenders nonetheless argued that SNR Denton should not be paid the fees sought on an interim basis (even though the amount sought was significantly less than the carve-out and hundreds of thousands of dollars were being paid to the Debtor's professionals).

13.     SNR Denton responded that the Lender Objection was not a sufficient objection to deny payment of the 85% of fees and 100% of expenses and was instead just another attempt by the Prepetition Lenders to hinder the Committee and limit its role and representation in these proceedings. The Office of the United States Trustee agreed that the Lender Objection was inappropriate, but the Debtor still refused to make the payment on the date the objection period expired on March 3, 2012. It was only after SNR had to incur unnecessary fees preparing a motion to compel compliance with the Interim Compensation Order that the Debtor finally relented and processed the payment. As a result, SNR Denton was paid $71,221.33 on March 12, 2012, $12,798.64 on March 23, 2012, and $38,734.33 on June 1, 2012, on an interim basis, related to its December 2011 and January 2012 fees and expenses in accordance with the Interim Compensation Order.

14.     SNR Denton subsequently decided that it would forego the right to file monthly fee statements and obtain interim compensation in order to avoid monthly litigation over its fees

---

[3] The Prepetition Lenders are the Bank of New York Mellon Trust Company, N.A., as master trustee and series trustee, Bank of America, N.A., on behalf of itself and certain prepetition letter of credit banks, and Wells Fargo Bank, N.A., as successor series trustee for the Series 2010A and 2010B fixed rate bonds in its capacity as bond trustee.

and expenses. SNR Denton instead would seek compensation in formal fee applications filed with the Court in accordance with Bankruptcy Code §§ 330 and 331. Similarly, the first opportunity to file an interim fee application arose on April 17, 2012 -- just days before plan confirmation and the conclusion of the Committee's role in these proceedings. As a result, SNR Denton decided that in the interest of limiting fees and expenses incurred in preparing its fee applications and responding to the inevitable objections received by the Prepetition Lenders, it would be most efficient to simply file this Final Fee Application.

### NARRATIVE SUMMARY OF PROFESSIONAL SERVICES RENDERED

15. In order to track the value of services performed on behalf of the Committee, after it was first retained, SNR Denton created a matter name and number for each of the approximately 16 categories of services,[4] to which its professionals and paraprofessionals assigned the time billed by them. Each matter number corresponds to a particular category of services.

16. A summary of SNR Denton's time by matter number is attached hereto as Exhibit B, a summary of SNR Denton's expenses by type of expenses is attached hereto as Exhibit C, and a summary of SNR Denton's time by timekeeper is attached as Exhibit D hereto. The invoices with the detailed time and expenses organized by matter number are attached as Exhibit E hereto.

17. Listed below are summaries of the services that SNR Denton provided the Committee with respect to each of the matter numbers:

  A. Matter 0001 - Case Administration. The time in this matter relates to the general administration of the case and certain miscellaneous pleadings.

---

[4] Although SNR Denton makes every effort to properly categorize the services, there may be several categories that fit the individual services performed during any particular fee period.

SNR Denton also billed time under this matter in connection with the: (i) review and analysis of general case issues and the Committee strategy; (ii) review of the Debtor's financial statements; (iii) review of the Debtor's cash reports; (iv) review of the docket and recent pleadings; and (v) replacement of a deceased Committee member.

(Fees: $27,768.00; 45.90 Hours)

B.    Matter 0002 - Asset Disposition (Asset Sales). By far the Committee's largest constituency was the more than 120 current and former residents with over $57 million of deposit claims against the Debtor. As noted above, these claims were not merely investments or ordinary debt claims. For the residents, their retirement savings and homes were at risk. Thus, consummation of the sale of the Debtor and the impact of that sale on the residents was critically important to the Committee. *See* Declaration of Michel Desjardins at ¶ 6, attached hereto as Exhibit G. As a result, SNR Denton billed a significant amount of time to this matter in connection with its significant efforts in investigating and performing diligence of potential bidders and negotiating the terms of the sale. SNR regularly conferred with Debtor's counsel and Houlihan Lokey regarding the sales process and reviewed proposed residency modifications and insisted on changes and met often with the Committee's constituents to provide comfort and guidance with respect to the sales process.

Specifically, in reviewing the proposed sale of the Clare at Water Tower to Chicago Senior Care, LLC ("**CSC**"), SNR Denton worked diligently to negotiate the improved treatment of residents in connection with proposed residency agreement modifications required by CSC to consummate the sale, including the inclusion of a certain sunset provision, which was not a part of CSC's originally proposed residency modifications. *See* Declaration of Betty Bergstrom at ¶ 8. This sunset provision was a critical improvement to the restructuring of the deposit claims. The residency agreements were being modified so that residents would only be paid when their particular residence sold -- as opposed to being paid upon the sale of any residence (which was what the residency agreements provided prior to modification). The sunset provision assured the residents that even through their rights were being modified at least part of their deposit claim would be paid by a date certain -- whether or not their specific unit would ever be resold. Through SNR Denton's continuous insistence, the sunset provision was likewise expanded to apply to legacy residents as well. SNR Denton also negotiated with the Debtor and CSC to ensure that even those residents that do not vote in favor of the plan would not be vacated from their homes and that if a promissory

note is issued in connection with sale of a unit (which could delay the payment of deposit claims since their unit was not entirely sold until paid for), it will not be for a period of greater than one year. *Id.*

Further, SNR Denton was instrumental in garnering resident' support for CSC and comfort with the residency agreement modifications proposed by CSC -- without which, the sale would not have been able to go through, as well as arranging for meetings between residents and CSC to increase the residents' comfort with CSC and alleviate the transition pains. *See* Declaration of Betty Bergstrom at ¶ 8; *see* Declaration of Michel Desjardins at ¶ 4.

(Fees: $93,373.50; 147.40 Hours).

C.    Matter 0003 - Retention/Fee Matters (SNR).  The majority of the time included in this category is time preparing the SNR retention documents and monthly fee statements.  As noted above, SNR Denton also had to review, analyze and respond to the Lender Objection as well as other fee objections submitted by the Prepetition Lenders.   Specifically, SNR Denton was required to prepare a motion to compel compliance with the Interim Compensation Order as result of the baseless Lender Objection to SNR Denton's first monthly fee statement.  Additional time in this matter relates to the attempt by the Prepetition Lenders to limit the Committee's right to have its professionals compensated under Bankruptcy Code § 330 by arguing that any compensation -- even if allowed under § 330 -- could not be paid unless the Committee could satisfy the § 506(c) surcharge standard.

(Fees: $29,628.00; 55.80 Hours).

D.    Matter 0005 - Disclosure Statement/Voting Issues.  Time spent in this category relates to the review and analysis of the four versions of the disclosure statement filed by the Debtor.  SNR Denton continuously reviewed revised drafts of the disclosure statement, including the fourth version, which was filed on the eve of the disclosure statement hearing, and which, for the first time, contained provisions that materially impacted the Committee's constituents through the inclusion of non-consensual third party releases.

SNR Denton also billed time to this category related to its research conducted in connection with the Committee's disclosure statement objections.  SNR Denton also drafted and filed the Committee's objection to the Debtor's Motion for an Order (I) Approving Bidding Procedures for the Sale of Substantially All of the Debtor's Assets; (II) Approving Break-Up Fee Payment; (III) Approving Procedures for the Cure, Assumption and Assignment of Contract; and (IV) Granting Related Relief [Dkt. No. 232],

pursuant to which the Committee objected to the originally proposed $1.6 million break-up fee. Through SNR Denton's extensive negotiations with the Debtor and CSC, they agreed to lower the break-up fee to $1.35 million, thereby providing the estate significant savings.

(Fees: $16,860.50; 32.10 Hours).

E.      Matter 0006 - Retention/Fee Matters/Objections (Others). Time spent by SNR professionals in this category includes reviewing and commenting on the Debtor's applications to retain its professionals -- DLA Piper LLP, Houlihan Lokey Capital, Inc., and Deloitte Financial Advisory Services LLP. SNR Denton closely scrutinized the proposed fees to be paid to the Debtor's professionals, specifically to its investment banker, Houlihan Lokey. SNR Denton filed an objection to Houlihan Lokey's retention application on behalf of the Committee. SNR Denton's objection to Houlihan Lokey's retention application and negotiations with the Debtor on this issue resulted in significant savings to the Debtor's estate by way of substantial reductions to Houlihan Lokey's proposed compensation. These negotiated modifications included: (i) the elimination of a $400,000 requested bonus/premium, (ii) the crediting of half of Houlihan Lokey's monthly fees against any transaction fee they will earn in the case beginning in February 2012 (resulting in savings of at least $125,000), and (iii) the crediting of $50,000.00 of a DIP financing fee against any transaction fee. SNR Denton also reviewed and analyzed the monthly fee statements circulated by the Debtor's professionals.

Additional time billed to this matter was incurred interviewing potential financial advisors to the Committee. The selection of a financial advisor with experience with continuing care retirement communities and the expertise to conduct and review due diligence on the prospective bidders was of utmost importance to the Committee. Once FTI Consulting Inc. was ultimately selected as the Committee's financial advisor, SNR Denton assisted with the preparation of FTI's retention application. Further, SNR Denton professionals regularly reviewed FTI's monthly fee statements.

(Fees: $30,373.00; 52.40 Hours).

F.      Matter 0008 - Avoidance Actions. This matter includes time spent by SNR professionals and paraprofessionals related to its investigation of the validity of the Prepetition Lenders' claims and liens and evaluation and diligence of potential causes of action against the Prepetition Lender Parties related to both the original 2007 bond issuance and the subsequent 2010 bond restructuring. The examination was of particular significance to the Committee and its constituents, because in the worst-case scenario of this case

-- whereby the Clare was forced into a liquidation, or the residents' residency agreements were not otherwise assumed by the Debtor and were deemed rejected (leaving the residents with valueless unsecured claims) -- an action against the Prepetition Lenders may have been the only source of recovery for residents and other unsecured creditors. The work included investigating the underlying bond and security documents as well as interviewing certain persons personally familiar with the facts concerning the Debtor's decision to withhold approximately $34 million in resident deposits beginning in early 2009 and its ultimate decision to transfer such funds to the Prepetition Lenders in July 2010 as part of a complex (and ultimately unsuccessful) restructuring of the bond debt. That investigation revealed that the 2010 restructuring not only resulted in the transfer of $34 million, it also altered important distribution language upon future defaults in favor of the Prepetition Lenders. Given that the sale of the Clare as a continuing CCRC had several fits and starts, and at one point appeared in serious doubt, the investigation was necessary and prudent. Moreover, the Committee had offered to delay its investigation until after a firm buyer was discovered, but the Prepetition Lenders refused such an extension, thereby necessitating the investigation to continue. It should be noted that the Committee ultimately chose not to bring any such action against the Prepetition Lenders when it became apparent that the Clare would be sold as a CCRC and residency agreements would be assumed.

(Fees: $81,776.00; 136.80 Hours).

G. <u>Matter 0009 - Tax Matters</u>. The time billed to this matter relates to the assistance SNR Denton provided to the Committee's constituents in educating the residents regarding the tax overpayments made by many of the residents and addressing issues related to allocating real property taxes and the refunds resulting from such overpayments. SNR Denton also proposed and negotiated with the Debtor a recoupment mechanism whereby the overpayments would be paid to the residents.

(Fees: $19,677.00; 34.60 Hours).

H. <u>Matter 0010 -- Court Appearances</u>. The time spent on this category includes time spent preparing for and attending numerous status and other hearings in the case.

(Fees: $48,861.50; 90.30 Hours).

I. <u>Matter 0011 - Committee Meetings</u>. Time in this category relates to the numerous Committee conference calls, emails and in-person meetings

regarding the developments in the bankruptcy case and strategy and related analysis. SNR Denton also spent a substantial amount of time at the Clare at Water Tower meeting with residents to educate them and make them comfortable regarding the bankruptcy proceedings and the sales process. *See* Declaration of Betty Bergstrom at ¶ 6; *see also* Declaration of Michel Desjardins at ¶ 4. SNR Denton was instrumental in making the residents comfortable with CSC's proposed residency agreement modifications, leading them to accept the modifications. *See* Declaration of Betty Bergstrom at ¶ 8; *see also* Declaration of Michel Desjardins at ¶ 4 . As stated above, the resident constituency was inexperienced with bankruptcy and unfamiliar with the process. Because of their unfamiliarity with the process and because they had so much at stake -- their life savings and their homes -- the Committee's main constituency required significant guidance and support. *See* Declaration of Michel Desjardins at ¶ 6.

(Fees: $97,255.50; 178.40 Hours).

J.    Matter 0012 - Cash Collateral/DIP Financing. Time spent on this matter relates to review and analysis of the terms of DIP loan agreements and the cash collateral order and the Committee's targeted objection to the terms of the DIP financing and the cash collateral usage, including the investigation period provided to the Committee to investigate the Prepetition Lender claims and liens, as well as the amount of the proposed Committee budget.

(Fees: $28,467.50; 53.20 Hours).

K.    Matter 0013 - Contested Matters and Other Motions. The time billed to this category relates to SNR Denton's review and analysis of various miscellaneous motions, such as the IFA escrow motion, the debtor's motion to set a bar date, the Prepetition Lenders' motion to limit the use of cash collateral to pay the Committee's professionals' fees and expenses, the notice of assumption and assignment of executory contracts, as well as SNR Denton's drafting of the motion to enter a scheduling order, and SNR Denton's review of the Debtor's responses to the Committee's discovery.

At least 70% ($20,219.50) of the time that SNR Denton billed to this category was specifically in connection with responding to the Joint Motion of the Prepetition Lender Parties for Entry of an Order (I) Limiting the Professional Fee Carve Out of the Official Committee of Unsecured Creditors, (II) Providing that Payment of Professional Fees Incurred by the Official Committee of Unsecured Creditors in Excess of the Carve-Out is Subject to the Standards Set Forth in Section 506(c), and (III) Granting Related Relief [Dkt. No. 386] (the "**506(c) Motion**"). The 506(c) motion is meritless in the

Committee's opinion and sought unprecedented relief that is both substantively and procedurally improper based on the incorrect argument that the Bankruptcy Code's § 506(c) surcharge provisions override the plan confirmation requirement of § 1129(a)(9) that a plan must pay allowed administrative claims in full. Through the 506(c) Motion, the Prepetition Lenders attempted to short-circuit the final fee application process that was approved by the Court in the confirmation of the Debtor's chapter 11 plan.

(Fees: $28,929.50; 51.30 Hours).

L.  <u>Matter 0015 - Reorganization Plan</u>.  Time billed to this category relates to SNR Denton's significant efforts in working on plan related issues in order to protect unsecured creditors and ensure them the greatest recovery possible, including reviewing and commenting on various drafts of the plan and disclosure statement, preparing an objection to confirmation of the plan (which included addressing the Prepetition Lenders' meritless argument that the plan was not "fair and equitable" if it paid all allowed administrative claims in full), working with the Debtor to clarify discrepancies present in the notice of assumption and assignment of executory contracts, reviewing and analyzing ballots and opt-out provisions, drafting a motion for entry of scheduling order in connection with plan discovery, drafting Committee initial discovery requests, drafting Committee responses to Debtor's initial discovery requests, working on deposition outlines, preparation for the plan confirmation hearing and negotiations with the Debtor and Prepetition Lenders regarding a potential settlement of the case.

SNR Denton's negotiations with the debtor regarding the plan and the Committee's related objection to plan confirmation was largely focused on certain non-consensual third party releases, injunctions and exculpations contained in the Plan, which required residents, as a condition to having their residency agreements assumed by the debtor, to give broad releases to a myriad of parties including the Debtor's management, interest holder and lenders. These third party releases essentially discharged certain third parties without their having to go through the bankruptcy process. The plan that was filed prior to the plan confirmation hearing contained a very broad third party release provision that provided as follows:

> [E]ach holder of a Claim (whether or not allowed) against, or interest in, the Debtor, and each person or entity participating in exchanges and distributions under or pursuant to this Plan, for itself and its respective successors, assigns, transferees, current and former officers, directors, agents and employees, in each case in their capacity as such, shall be deemed to have released *any and all claims* and causes of action against the Released Parties and all of their respective officers,

>directors, employees, attorneys, advisors, professionals, agents, or other related persons arising prior to the Effective Date.

Fourth Amended Plan, § 9.9 (emphasis added). "Released Parties" was defined broadly to include (i) the Debtor, (ii) the Prepetition Lenders, (iii) the Franciscan Sisters of Chicago Service Corporation, (iv) the Franciscan Sisters of Chicago, (v) the Illinois Finance Authority, (vi) the DIP lender, (vii) the Committee and its members and (viii) the current and former officers, directors, members, managers, employees, attorney and advisors, each in their respective capacities as such, of each of the foregoing. Further, the plan released the majority of these parties in "any capacity" in which they may act or serve.

SNR Denton objected to these broad third party releases and had to take discovery and prepare for depositions in connection with these releases, as well as substantially brief the issue. Through SNR Denton's efforts in contesting these broad releases, at the plan confirmation hearing, the Court ordered that the releases be narrowed to only those causes of action relating to the Plan, the Asset Purchase Agreement, the DIP Agreement, the bond documents, the 2010 exchange offer and any claims related to or arising under any current residency agreement and residency agreements as assumed. *See* Declaration of Betty Bergstrom at ¶ 9.

SNR Denton also negotiated with the Debtor and Prepetition Lenders an improved recovery for the Debtor's trade creditors (who were projected under the plan to receive 0% recovery). Following SNR Denton's insistence, the plan was amended to include a "Plan Contribution Amount" of $75,000 to be distributed to third-party trade creditors.

The Committee's objection to the plan, prepared by SNR Denton, also focused on addressing the Prepetition Lenders' arguments in its plan confirmation objection that the plan was not fair and equitable and was not in the best interests of creditors because it permits the allowed administrative expenses of the Committee's professionals to be paid from the Prepetition Lenders' collateral. This is yet another example of the Prepetition Lenders' baseless attempts to hinder the Committee and SNR Denton, which in turn required SNR Denton to incur fees in addressing these arguments.

(Fees:  $77,858.50;  146.30 Hours).

M.     <u>Matter 0016 - Claims Administration and Objections</u>. Time billed to this category was related to reviewing and analyzing the Debtor's statement of financial affairs and schedules, the prepetition unsecured claims and the holders of same and various miscellaneous motions. SNR Denton also billed

time to this matter in connection with its review of the bar date motion and the confusion caused over whether or not current and former residents were required to file proofs of claim.

(Fees: $9,341.00; 16.30 Hours).

18. It is the Committee's and SNR Denton's understanding that SNR Denton's total fees and expenses incurred during this bankruptcy case exceed the budget set forth in the cash collateral order. The factual reasons for this increase and the legal impact are set forth in the *Notice of the Official Committee of Unsecured Creditors of Projected Fees Through the Anticipated Effective Date of the Pending Chapter 11 Plan* [Dkt. No. 308] and the *Response and Opposition of the Official Committee of Unsecured Creditors to the Joint Motion of the Prepetition Lender Parties for Entry of an Order (I) Limiting the Professional Fee Carve Out of the Official Committee of Unsecured Creditors, (II) Providing that Payment of Professional Fees Incurred by the Official Committee of Unsecured Creditors in Excess of the Carve-Out is Subject to the Standards Set Forth in Section 506(c), and (III) Granting Related Relief* [Dkt. No. 410].

## BASIS FOR RELIEF REQUESTED

19. Section 330 of the Bankruptcy Code authorizes the Court, after notice and a hearing, to award to a trustee, an examiner, or other professional employed under Section 327:

(a) reasonable compensation for actual, necessary services rendered by the trustee, examiner, professional person, or attorney and by any paraprofessional person employed by any such person; and

(b) reimbursement for actual, necessary expenses.

11 U.S.C. § 330. Section 503(b), moreover, provides that any compensation and reimbursement awarded under Section 330(a) shall be paid as an administrative expense of the estate. 11 U.S.C. § 503(b).

20. In determining the amount of reasonable compensation to be awarded under Section 330(a), the bankruptcy court must consider the nature, the extent and the value of such services, taking into account all relevant factors, including:

(a) the time spent on such services;

(b) the rates charged for such services;

(c) whether the services were necessary to the administration of, or beneficial at the time at which the service was rendered toward the completion of, a case under this title;

(d) whether the services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed;

(e) with respect to a professional person, whether the person is board certified or otherwise has demonstrated skill and experience in the bankruptcy field; and

(g) whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in cases other than cases under this title.

11 U.S.C. § 330(a)(3).

21. In conjunction with the factors enumerated in Section 330(a)(3), some courts also look at the so-called "Johnson Factors" which grew out of *Johnson v. Georgia Highway Exp., Inc.*, 488 F.2d 714, 717-19 (5th Cir. 1974), *abrogated on other grounds by Blanchard v. Bergeron*, 489 U.S. 87 (1989), a civil rights case. The *Johnson* Factors were deemed applicable to bankruptcy cases in the case of *In re First Colonial Corp. of America*, 544 F.2d 1291, 1299 (5th Cir. 1977), *cert. denied*, 431 U.S. 904 (1977). In that case, the court identified the following twelve factors to be considered in awarding reasonable compensation:

(a) the time and labor required;

(b) the novelty and difficulty of the questions;

Document    Page 18 of 20

(c)      the skill requisite to perform the legal service properly;

(d)      the preclusion of other employment by the attorney due to acceptance of the case;

(e)      the customary fee;

(f)      whether the fee is fixed or contingent;

(g)      time limitations imposed by the client or the circumstances;

(h)      the amount involved and the results obtained;

(i)      the experience, reputation, and ability of the attorneys;

(j)      the "undesirability" of the case;

(k)      the nature and length of the professional relationship with the client; and

(l)      awards in similar cases.

22.     In general, the *Johnson* Factors are similar to those listed in Section 330(a)(3). *See In re Phillips*, 291 B.R. 72, n. 31 (Bankr. S.D. Tex. 2003).

23.     Other courts have endorsed a "lodestar" analysis, as established in *Lindy Bros. Builders, Inc. v. Am. Radiator & Sanitary Corp.*, 487 F.2d 161, 168 (3d Cir. 1973), *appeal following remand*, 540 F.2d 102, 117 (3d. Cir. 1976). The "lodestar" is obtained by multiplying the reasonable number of hours times a "reasonable" hourly rate. In order to determine a "reasonable" hourly rate, courts generally look at the professional's normal billing rates outside of bankruptcy. *Id.* Generally, so long as the rates being charged are the professional's normal rates charged in bankruptcy or non-bankruptcy matters alike, they will be afforded a presumption of reasonableness. *In re Jefsaba, Inc.*, 172 B.R. 787, 798 (Bankr. E.D. Pa. 1994). Along with a reasonable rate, the professional must also demonstrate the reasonableness of the time spent by the professional on the various tasks. *Id.*

24.     Finally, some courts use a combination of the *Johnson* Factors and the lodestar analysis. Consequently, the lodestar may be adjusted either upward or downward according to

the *Johnson* Factors. *See Miner v. Stehlik & Assocs. (In re Broady)*, 92 B.R. 389 (Bankr. W.D. Mo. 1988).

25. The Seventh Circuit has not definitively adopted either the *Johnson* Factors or the "lodestar" analysis, although it has inherently sanctioned the use of both approaches. *See In re UNR Indus.*, 986 F.2d 207, 210 (7th Cir. 1993) (approving bankruptcy court's application of lodestar analysis); *In re Geraci*, 138 F.3d 314, 317-18 (7th Cir. 1998) (approving bankruptcy court's application of the *Johnson* Factors).

26. The Fees and Expenses requested by SNR Denton are appropriate under all three standards. In particular, SNR Denton's request is fair and reasonable given (i) the time required to address the complex issues arising in this case, (ii) that the rates charged by SNR Denton are standard in the industry and in Chicago, and in fact are much lower than the Debtor's counsel's rates, as well as those of Prepetition Lenders' counsel, (iii) the lead role the Committee took on many matters, including negotiating significant improvement in the treatment of residents and encouraging the residents to support the sale of the Debtor to CSC, (iv) the demanding and at times intense nature of these cases (the residents looked to SNR Denton to guide them throughout the case due to their lack of confidence in the Clare at Water Tower's management and its disclosures to the residents), (v) the skill and experience of the attorneys working on this matter in connection with bankruptcy work in general, and Committee representations in particular, and (vi) the compensation requested herein includes a discount from SNR Denton's normal rates that was agreed with the Committee upon the retention of SNR Denton and is less than the customary hourly rates normally charged by SNR Denton in material bankruptcy cases and, in some cases, by other professionals at other firms of comparable size, stature and experience.

## **CONCLUSION**

**WHEREFORE,** SNR Denton respectfully requests that the Court enter an order (i) allowing fees in the amount of $593,087.00 for over 1,000 hours of professional services rendered by SNR Denton to the Committee during the Final Application Period and reimbursement of actual and necessary expenses incurred in the sum of $9,422.53 on a final basis as a Chapter 11 administrative expenses of the estate; (ii) authorizing and directing the Debtor to pay SNR Denton the amount of $479,755.23 in full settlement of the sums accrued during the Final Application Period; and (iii) such other and further relief as this Court believes necessary and proper.

Respectfully submitted this June 22, 2012.

                                                    SNR DENTON US LLP

                                                    _/s/ Stefanie L. Wowchuk_
                                        Sam J. Alberts (admitted pro hac vice)
                                        Thomas A. Labuda (IL Bar 6225401)
                                        Stefanie L. Wowchuk (IL Bar No. 6294131)
                                        233 S. Wacker Drive
                                        Suite 7800
                                        Chicago, IL 60606
                                        sam.alberts@snrdenton.com
                                        thomas.labuda@snrdenton.com
                                        stefanie.wowchuk@snrdenton.com
                                        Telephone:  (312) 876-8000

                                        *Counsel to the Official Committee of Unsecured*
                                        *Creditors of the Clare at Water Tower*